**UNITED STATES of America**

**v.**

**Kenneth Lee ESTES.**

**Crim. No. 84–55–1.**

United States District Court, D. Vermont.

March 15, 1985.

As Amended April 8, 1985.

Christopher Baril, Asst. U.S. Atty., Rutland, Vt., for plaintiff.

Richard I. Rubin, Barre, Vt., for defendant.

## FINDINGS OF FACT, OPINION AND ORDER

BILLINGS, District Judge.

*Introduction*

This matter came before the Court for a hearing on all pending motions on February 4, 1985. The defendant was present and represented by Richard Rubin, Esq. Present on behalf of the Government were Assistant U.S. Attorneys Peter Hall and Chris Baril.

Defendant stands charged by a three-count indictment with violations of 18 U.S.C. § 2113(b) (bank robbery) and 18 U.S.C. § 1623 (false declarations before a

grand jury). The following pretrial motions have been filed on defendant's behalf:

1. Motion to Dismiss Indictment;
2. Motion for Disclosure of Grand Jury Testimony;
3. Motion to Suppress Taped Communications;
4. Motion to Suppress Evidence Obtained Pursuant to Search; and
5. Motion in Limine.

After setting forth the facts surrounding the case, as found from the evidentiary hearing, the Court will address each of the pending motions *seriatim*. For purposes of the motions now before the Court, we must assume the truth of the evidence admitted at the hearing.

*Findings of Fact*

On or about February 24, 1982, employees at the Federal Reserve Bank in Boston, Massachusetts discovered that approximately $55,000.00 was missing from a money shipment that had been shipped via the Purolator Armored car service from the Vermont National Bank in Rutland, Vermont. On or about the same day defendant, an employee of Purolator residing in Manchester, Connecticut, arrived home with a motorcycle saddlebag full of money. Defendant's then wife, now Mrs. Lydia Turbert, observed defendant arrive home and noticed he had a strange look on his face. She asked defendant what was wrong and he then showed her the money in the saddlebag. Defendant told his wife he stole the money from Purolator. The couple then proceeded upstairs to their bedroom and defendant poured the money out of the saddlebag and onto the couple's bed.

At first, Mrs. Turbert was surprised and asked defendant if he could return the money to Purolator. She then decided it would be nice to keep the money, as she and her husband were so poor they could not adequately provide for their three children. Accordingly, Mrs. Turbert decided to assist her husband with the money.

Defendant told his wife that he used a "crimper" to open and, then, reseal the canvas bags from which he removed the money. Mrs. Turbert had earlier observed the crimping device used by defendant hidden in a closet in their home.

Mrs. Turbert observed defendant take the first and last bill from each stack of bills, tear them into small pieces and place them in a jar of carpet cleaning solution so that the torn-up bills would dissolve. He then hid the rest of the money in a closet. The next day, defendant, while in his wife's presence, placed as much money as would fit in a plastic cooler. He then covered the cooler with a plastic garbage bag. Defendant took the money, the crimper and the cleaning solution to the Portland Reservoir. He buried the money and threw the crimper and cleaning solution in the reservoir.

While defendant was at the reservoir, Mrs. Turbert removed a front panel from one of the steps in the stairway of their home. This was done in an effort to find a place to hide the money that would not fit in the cooler, estimated by Mrs. Turbert to be approximately $15,000.00. Mrs. Turbert placed the money in a hollow space behind the stair. She then replaced the front panel.

With the money that was hidden behind the stairs, the couple purchased several items for their home, including a television, a stereo, mattresses and linens for their childrens' beds and kitchen supplies. Defendant also purchased a used van with the stolen money. The money used to buy the van was "laundered" by Mrs. Turbert who made trips to several different Hartford banks for the purpose of exchanging smaller, stolen bills for larger bills.

During the course of time, the money supply behind the stairway depleted, so the couple made several trips to the reservoir to unearth and use more of the stolen money that defendant had hid there.

During the summer months of 1982, Mrs. Turbert moved out of the couple's home and moved into a friend's house. During the time they were separated, Mrs. Turbert made several drug purchases on defendant's behalf. These purchases consisted largely of cocaine. Mrs. Turbert made ap-

proximately six purchases on defendant's behalf and the cost of each purchase was approximately $2,500.00. Mrs. Turbert felt compelled to buy the drugs, as her husband threatened to file a claim for desertion if she did not.

Mrs. Turbert and defendant were divorced on December 6, 1983. Mrs. Turbert married Mark Turbert on April 14, 1984.

In early July of 1984, Special Agent Callahan, an FBI agent stationed in Waterbury, Connecticut, received a call from Agent Millen, an FBI agent in Hartford, Connecticut, who stated that Mrs. Turbert had information regarding a Purolator robbery. Thereupon, Agent Callahan contacted Mrs. Turbert and arranged to meet with her.

On July 18, 1984, Agent Callahan went to Mrs. Turbert's home in Torrington, Connecticut to meet and discuss with her the information she had regarding the robbery. During the meeting, which lasted approximately three hours, Mrs. Turbert explained that she was defendant's ex-wife and that, in February of 1982 when they were still married, defendant robbed a substantial sum of money from Purolator.

Before detailing the events surrounding the robbery, Mrs. Turbert expressed concern that she would be prosecuted for her involvement with the crime and that she would lose her children as a result. Mrs. Turbert reiterated this concern several times during the course of the meeting. She also explained that she decided to come forward with information about the crime because defendant's present wife's ex-husband, David Nallon, threatened to reveal the information if she (Mrs. Turbert) did not. Accordingly, in exchange for her cooperation and information, Mrs. Turbert wanted assurances from the Government that she would not be prosecuted. Agent Callahan explained that, although he could not give Mrs. Turbert advice as to whether she was privileged from testifying against her former husband or as to what her rights were in general, he could give her verbal assurances that, if she cooperated, she would not be prosecuted.

After receiving the necessary assurances, Mrs. Turbert gave Agent Callahan information regarding the crime. At the end of the meeting, the parties decided to tape a telephone conversation between Mrs. Turbert and defendant. Mrs. Turbert explained that the conversation would have to take place at a public phone, as defendant believed that both his phone and Mrs. Turbert's phone were tapped. At the original meeting, no date was set for taping the conversation, rather, it was decided that Mrs. Turbert would contact Agent Callahan when she was ready.

Subsequently, Mrs. Turbert contacted Callahan to arrange a time to tape the conversation. The parties agreed to do the taping on July 24, 1984. During that conversation, Mrs. Turbert again expressed her desire to receive assurance of immunity before going forward. Agent Callahan told Mrs. Turbert that she would receive a letter of immunity from the United States Attorney's office in Vermont before the date set for the phone call to defendant.

On July 24, 1984, Agent Callahan and Agent John Hooks arrived at Mrs. Turbert's residence for the purpose of taping the conversation. At that time, Mrs. Turbert asked about the letter of immunity and Mr. Callahan again reassured her that she would not be prosecuted and explained that the letter was forthcoming. In exchange for these assurances, Mrs. Turbert agreed to sign a consent form which stated that she "voluntarily and without threat or promise" consented to tape the conversation. If Mrs. Turbert did not receive these assurances, she would not have made the phone call. The parties then proceeded to a public telephone booth and Mrs. Turbert placed a call to her former husband. However, the phone was malfunctioning and the parties were forced to go to another public phone booth in a different part of town. Mrs. Turbert placed a second call to defendant. The defendant then called her back and the ensuing conversation was taped. During the taping, Agents Callahan and Hooks and Mr. Turbert were all standing a few feet away from Mrs. Turbert.

At no time during the course of the phone calls did Mrs. Turbert expressly or impliedly withdraw her consent to tape the conversation with defendant.

On September 15, 1984, Mrs. Turbert recorded another conversation with defendant. This conversation was recorded at Mrs. Turbert's residence in Torrington on a Radio Shack home taping device. Mrs. Turbert voluntarily turned over the tape to Agent Callahan, who had no prior knowledge of this second taping.

On or about October 10, 1984, Mrs. Turbert received a letter of immunity from prosecution from Assistant U.S. Attorney Peter Hall. Thereafter, Mrs. Turbert testified against defendant before the Grand Jury investigation of this matter. At no time during the course of her dealings with authorities regarding this matter was Mrs. Turbert advised that she could not claim a privilege against giving testimony about her marital communications with defendant.

*Discussion*

*A. Motion To Dismiss Indictment*

Defendant moves to dismiss the indictment, claiming that it is tainted by Mrs. Turbert's incompetent testimony before the Grand Jury and that it was obtained through gross prosecutorial misconduct. The government denies that Mrs. Turbert's testimony amounted to incompetent evidence and further contends that there has been no showing of prosecutorial misconduct in this case.

■ The defendant claims that Mrs. Turbert's testimony before the Grand Jury was incompetent because it pertained to confidential marital communications and, as such, was privileged from disclosure. Ordinarily, the marital communications privilege prevents the testifying spouse (or former spouse) from disclosing confidential communications between the spouses. *United States v. Ammar*, 714 F.2d 238, 258 (3rd Cir.), *cert. denied sub nom., Stillman v. United States*, — U.S. —, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983). This privilege survives the marriage, *Pereira v.*

*United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1954), and is applicable in Grand Jury proceedings. F.R.E. 1101(c), (d). However, a number of courts have held that confidential marital communications concerning ongoing criminal activity are not protected by the privilege. *United States v. Archer*, 733 F.2d 354 (5th Cir. 1984); *United States v. Broome*, 732 F.2d 363 (4th Cir.1984); *United States v. Ammar, supra*, at 258; *United States v. Mendoza*, 574 F.2d 1373 (5th Cir.1978); *United States v. Kahn*, 471 F.2d 191 (7th Cir.1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). This is likely to be the rule followed by the Second Circuit. *See United States v. Cotroni*, 527 F.2d 708 (2d Cir.1975), *citing United States v. Kahn, supra. See also United States v. Shipp*, 578 F.Supp. 980, 991 (S.D.N.Y.1984), *citing United States v. Mendoza, supra.*

■ In this case, all of Mrs. Turbert's Grand Jury testimony related to defendant's ongoing criminal activity. Moreover, Mrs. Turbert had made the conscious decision, almost from the start, to play an active role in the secreting and use of the stolen money. Therefore, since it related exclusively to ongoing criminal activity, Mrs. Turbert's testimony does not fall under the confidential marital communications privilege.

■ Defendant claims that because Mrs. Turbert is not a co-defendant in this case and because she does not stand to be prosecuted for her involvement in the crime, the marital communications privilege should apply. However, the "criminal activity" exception to the privilege has not been so narrowly construed. So long as the conversations are made in the *furtherance* of criminal activity, the exception applies. *See United States v. Ammar, supra*, at 258. There need be no showing of culpability on the part of the testifying spouse. *Accord United States v. Entrekin*, 624 F.2d 597, 598 (5th Cir.1980). In this case, the record discloses that all the challenged conversations (and acts) were made in the furtherance of joint efforts to hide and use the stolen money.

The "criminal activity" exception evolved because it was determined that the need to attain justice is greater than the need to encourage domestic tranquility *See Ammar, supra,* at 257. Other privileges, such as the attorney-client privilege have been similarly limited. This Court can divine no logical reason to limit the "criminal activity" exception to culpable spouses.

■ The fact that Mrs. Turbert's Grand Jury testimony is not privileged *per force* vitiates defendant's claim that Mrs. Turbert's testimony was obtained through prosecutorial misconduct.

Accordingly, defendant's motion to dismiss the indictment must be denied.

### B. Motion for Disclosure of Grand Jury Testimony

The defendant seeks disclosure of the Grand Jury testimony of Lydia Turbert, defendant's ex-wife, Robert Plikaitis and Donald Cowles, both employees of Purolator. The Government opposes the motion on the ground that the defendant has failed to show a "particularized" need therefor.

Ordinarily, minutes of Grand Jury investigations may not be disclosed. Fed.R. Cr.P. 6(e)(2). An exception to this rule exists where the court grants disclosure preliminarily to, or in connection with, a judicial proceeding or upon a showing by the defendant that grounds may exist to dismiss the indictment because of matters occurring before the Grand Jury. *Id.* at 6(e)(3)(C)(i) and (iii).

■ The disclosure of Grand Jury testimony prior to, or in connection with, judicial proceedings requires a showing by the defendant that there exists a "particularized" need for such disclosure. *Dennis v. United States,* 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1966); *United States v. Youngblood,* 379 F.2d 365, 369 (2d Cir.1967).

■ The Supreme Court has recently restated this standard. In *Illinois v. Abbott & Associates, Inc.,* 460 U.S. 557, 567, 103 S.Ct. 1356, 1361, 75 L.Ed.2d 281 (1983), the Court stated:

The court, however, is authorized by Rule 6(e)(3)(C) to permit certain disclosures that are otherwise prohibited by the "General Rule of Secrecy." The scope of that authority has been delineated in a series of cases setting forth the standard of "particularized need."

Further, the Court pointed out that "particularized need" means more than mere relevance. *Id.* at 568, 103 S.Ct. at 1362. The party seeking disclosure must show: (1) that the need for the disclosure outweighs the need for secrecy; (2) that the materials are necessary to avoid injustice; and (3) that the request is structured to cover only those materials that are needed. *Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979).

■ As presently framed, defendant's motion for Grand Jury testimony is premised solely on the assertion that the requested material is needed to prepare an adequate defense. This claim is more akin to an assertion that the material is relevant, proscribed in *Illinois, supra,* 460 U.S. at 568, 103 S.Ct. at 1362, than a showing of a particularized need for the material in order to prevent injustice to defendant.

Because defendant has failed to show a particularized need for the material under the three-prong test set forth in *Douglas, supra,* the motion for Grand Jury testimony must be denied.

### C. Motion to Suppress Taped Statements

The defendant has moved to suppress tape recordings made by Mrs. Turbert of two, separate conversations she had with defendant over the telephone. As grounds for this motion, defendant claims that the tape recordings violate the provisions of 18 U.S.C. § 2511(2)(c), the so-called wiretap statute, because Mrs. Turbert did not voluntarily agree to make the tape recordings.

Under the wiretap statute, 18 U.S.C. § 2515, all evidence gathered in violation of § 2511, which makes it illegal to intercept any wire or oral communication, must be suppressed. Section 2511(2)(c) sets forth

an exception to this rule which provides that:

> It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

Bottomed on this particular section of the wiretap statute, the only issue raised by defendant's argument is whether the two tapings, one recorded in the presence of Agents Callahan and Hooks on July 24, 1984 and the other recorded by Mrs. Turbert at home on September 15, 1984, were consensually intercepted by Mrs. Turbert.

■■■ Whether a person's consent to intercept a conversation is valid depends upon whether it is voluntary and uncoerced. *United States v. Kolodziej,* 706 F.2d 590, 593 (5th Cir.1983). The Government has the burden of proving the voluntariness of consent and, where there is a claim of coercion, the Government must show that there has been no "undue pressure, threats, or improper inducement." *Id.* at 593. Here, the only possible facts from which this Court can infer coercion is Mrs. Turbert's request for immunity in exchange for recording the conversations. However, it is well settled that "raised expectations and hopes for leniency do not amount to coercion or improper inducement." *Id. See also United States v. Salisbury,* 662 F.2d 738, 739 (11th Cir. 1981), *cert. denied,* 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982) (absent evidence that interceptor was overcome by threats or improper inducement, there can be no finding of involuntariness).

■■■ Contrary to defendant's assertions, the facts of this case indicate that Mrs. Turbert freely entered into the agreement to tape the conversation with defendant on July 24, 1984. To be sure, Mrs. Turbert's motives at that time were self serving, but her free will was not overborne by her decision to cooperate with the Government.

■■■ As for the conversation recorded on September 15, 1984, it cannot be said that Mrs. Turbert intercepted the conversation voluntarily or that she was acting under color of law at the time, as is required under the § 2511(2)(c) exception. The September 15 conversation was recorded accidentally and without the knowledge of law enforcement officials. The September 15 interception was not violative of the wiretap statute, however, because § 2511(2)(d) specifically exempts situations in which one party to the conversation is herself the interceptor. Having taped the conversation herself, and not in the presence of or at the direction of Agent Callahan, Mrs. Turbert was the sole interceptor of the conversation and, thus, the recording was not in violation of the statute. *See United States v. Turk,* 526 F.2d 654, 657 (5th Cir. 1976). Nor did Agent Callahan violate the statute by listening to the September 15, 1984 taped conversation. *See id.* at 658–59.

Accordingly, defendant's motion to suppress the taped conversations must be denied.

### D. Motion to Suppress Evidence Obtained Pursuant to Search

Defendant next claims that certain evidence obtained pursuant to execution of a search warrant at his home should be suppressed. Defendant argues that the information in the affidavit filed in support of the warrant was obtained in violation of federal law. According to defendant, since much of the information in the affidavit was privileged under the marital communications rule, it was obtained in violation of federal law. F.R.E. 1101(c) and (d). The Government, on the other hand, argues that even if the information in the affidavit is privileged, it was nevertheless obtained in good faith and, thus, suppression would be improper.

■■■ Without a doubt, the marital communications privilege applies to proceedings held for the issuance of search

warrants. F.R.E. 1101(c) and (d). *See also United States v. Lefkowitz*, 618 F.2d 1313, 1317 n. 5 (9th Cir.1980). However, as noted previously, *supra* at p. 568, the privilege does not apply to communications about ongoing criminal activity. Since much, if not all, of the information supplied by Mrs. Turbert in the affidavit relates to criminal activity, it is not privileged. Moreover, even if the information were privileged, defendant has failed to produce any evidence that the information was obtained in reckless and dishonest disregard for its validity. *See United States v. Leon*, —— U.S. ——, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

For the above-stated reasons, defendant's motion to suppress the evidence obtained pursuant to execution of the search warrant must be denied.

*E. Motion in Limine*

Defendant's final claim is that all of Mrs. Turbert's testimony must be excluded from trial on the grounds that it is privileged under the marital communications rule. To be privileged, the marital communications must be confidential and they must have occurred during the marriage. Also, as stated earlier, *see Discussion, supra*, at pp. 568–569, the marital communications privilege does not apply to conversations made in the furtherance of criminal activity. Accordingly, Mrs. Turbert's testimony will be excluded only to the extent that it relates to communications between herself and defendant that occurred during their marriage, that were intended to be confidential and that do *not* relate to ongoing criminal activity. This limitation applies equally to defendant's communicative acts witnessed by Mrs. Turbert during their marriage.

### ORDER

For the foregoing reasons, all of defendant's motions must be and are DENIED.

SO ORDERED.