UNITED STATES of America, Plaintiff,

v.

PREMISES KNOWN AS 281 SYOSSET WOODBURY ROAD, Woodbury, New York, A Parcel of Real Property and All Appurtenances Thereto, Lying in Nassau County, New York, Said Property Being Titled in the Name of Lydia Camiola, Defendant.

No. CV–90–3626.

United States District Court, E.D. New York.

Sept. 9, 1994.

Sarah J. Lum, Asst. U.S. Atty., Brooklyn, NY, for plaintiff.

Minna J. Kotkin, BLS Legal Services Corp., Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

This is an appeal by plaintiff United States of America (the "Government") seeking to reverse the discovery order of the Magistrate Judge, entered on the record on November 2, 1993, and November 16, 1993. For the following reasons, the Magistrate Judge's order is reversed.

### FACTS

In February of 1990, John Rosario Camiola was arrested in South Carolina on drug trafficking charges. On or about August 2, 1990, Mr. Camiola entered into a plea agreement with the Government wherein he, *inter alia,* pleaded guilty to possession of cocaine with intent to distribute. Pl.'s Mem., Att. 1 (the "Plea Agreement"), ¶ 3. Mr. Camiola agreed to cooperate with federal officials in

their investigation of the distribution of controlled substances and related unlawful activities, Plea Agreement, ¶ 6, and agreed that all assets acquired as a result of illegal trafficking in drugs shall be surrendered to the Government and/or other law enforcement officers, Plea Agreement, ¶ 7. The parties agreed, however, to litigate in a civil forfeiture proceeding a parcel of real property located at 281 Syosset–Woodbury Road, Woodbury, New York (the "Property"), which is held in the name of Mr. Camiola's wife, and the claimant in this action, Mrs. Lydia Camiola (the "Claimant"). Plea Agreement, ¶ 8.

The Property was the subject of an earlier forfeiture action in connection with a prior conviction of Mr. Camiola in 1984, in the Eastern District of Pennsylvania.[1] That action was dismissed by stipulation in 1986. In this action, which was commenced in 1990, the Government contends that from 1986 to 1989, the Property was paid for with proceeds of illegal drug trafficking and was used to facilitate such drug trafficking in 1989 and 1990 and is, therefore, subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) and (a)(7).[2] Claimant contends that the Property was purchased for her with the proceeds of a sale of her mother-in-law's home and a bank mortgage and that she had no knowledge of her husband's illegal drug activities prior to his 1990 arrest. Claimant has therefore asserted, among other defenses, the "innocent owner" defense. See 21 U.S.C. § 881(a)(7) ("no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act of omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.").

This appeal arises out of Claimant's refusal to answer certain questions posed to her during her deposition. During three days of deposition testimony, Claimant gave testimony regarding conversations she had with her husband prior to his arrest in 1990. There is no dispute that Claimant waived any marital privilege for conversations she had with her husband prior to his 1990 arrest. However, sometime after her husband's arrest, an undercover agent from the Drug Enforcement Agency telephoned Claimant and initiated a conversation regarding the sale of marijuana. After stating that she could put this person in touch with "Carlos," a friend of her husband's who could purchase the drugs and thereby raise money for Mr. Camiola's defense, the following colloquy occurred:

Q. And your role in this was to put Carlos in touch with Jerry?

A. Correct.

Q. And you understood at that time that you were talking about the sale of marijuana?

A. Yes, because my husband had told me and also Carlos—

At this point Claimant's attorney instructed her not to continue and invoked "[a]ll marital privileges, as, I assume, I am taking it as this conversation having happened after John Camiola was arrested." Deposition of Lydia Camiola, November 2, 1993 ("Camiola Dep."), at 421–22.[3] Claimant testified that this conversation did in fact take place after her husband was arrested and that when the conversation took place no one else was present, nor was anyone listening. Camiola Dep. at 423.

### A. The Magistrate's Ruling

The Government sought an order from the Magistrate Judge compelling Claimant to answer questions regarding conversations she had with her husband following his arrest in 1990. During oral argument on November 2, 1993, the Magistrate Judge stated that

1. Mr. Camiola was incarcerated from 1984 to 1986 on federal drug charges.

2. This statute provides in relevant part that "[t]he following shall be subject to forfeiture to the United States and no property right shall exist in them: ... [a]ll ... things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter ... [and] [a]ll real property ... which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment[.]" 21 U.S.C. § 881(a)(6), (7).

3. Claimant was also asked "Can you tell me what [your husband] said to you about his arrest?" but was instructed on advice of counsel not to answer. Camiola Dep. at 84.

Claimant's conversations with her husband following his arrest were protected by the privilege against adverse spousal testimony and that she could not be compelled to testify against her husband absent a stipulation from the Government that it would not use her statements against Mr. Camiola in any future criminal proceeding. Transcript of November 2, 1993 ("Nov. 2d Tr."), at 11–13. The Magistrate Judge specifically stated that the joint crime exception is not applicable because of the Second Circuit's holding that there is no joint crime exception in the context of the privilege against adverse spousal testimony. *In re Grand Jury Subpoena United States,* 755 F.2d 1022 (2d Cir.1985), *cert. granted sub nom. United States v. Koecher,* 474 U.S. 815, 106 S.Ct. 56, 88 L.Ed.2d 46 (1985), *vacated as moot,* 475 U.S. 133, 106 S.Ct. 1253, 89 L.Ed.2d 103 (1986). "And what it says is that no subject matter, joint criminal activity or not, is an appropriate subject of inquiry by the Government when the testifying spouse, the wife, doesn't want to be made to testify against her husband." Nov. 2d Tr. at 12.

Upon the Government's motion for reconsideration, the Magistrate Judge seemed to agree with the Government's position that the privilege against adverse spousal testimony is only applicable in criminal actions. Transcript of November 16, 1993 ("Nov. 16th Tr."), at 8–9. The Magistrate Judge stated that although he appreciated that "civil forfeiture has a criminal ring to it,"

> I'm not sure that it's particularly relevant because what it seems to me is that that argument applies much more to an invocation of a privilege that Mrs. Camiola would assert to protect herself from some kind of punitive component and, therefore, the Fifth Amendment analogy doesn't ring

with great resonance for me upon further reflection.

Nov. 16th Tr. at 8. However, the Magistrate Judge also held that his ruling of November 2, 1993, would stand because "the policy of the privilege against adverse spousal testimony is a privilege of a spouse not to be compelled to be the source of incriminating evidence in a prosecution against her spouse." Nov. 16th Tr. at 8. The Magistrate Judge again noted the Government's unwillingness to grant Claimant use immunity and reasoned that "what the witness is asking for is a protection that is completely coextensive with the limitation of the adverse testimonial privilege to the criminal context." Nov. 16th Tr. at 8–9.[4] In upholding his previous ruling, the Magistrate Judge also said that the protection Claimant is seeking—that is, protecting her husband from a future criminal action through fruits of her testimony—is consistent with the marital privilege asserted:

> In other words, you can use anything I say against him in any civil proceeding, in any tax proceeding, just agree with me that you won't take my words to prosecute my husband. That's what the law has recognized for hundreds of years is appropriate for the Government to do. That's what I think there's a risk of happening here unless the Government will stipulate to the contrary and that's why my ruling stands.

Nov. 16th Tr. at 13.[5]

## DISCUSSION

### I. *Standard of Review*

■ Rule 72 of the Federal Rules of Civil Procedure and the Federal Magistrate's Act, 28 U.S.C. §§ 631–639, provide the standard under which a district court should review a

---

4. In its Reply Memorandum, the Government argues that the Magistrate Judge's ruling should be reversed because "it interferes with the role of [the] executive branch of government, which has responsibility for decisions to grant immunity." Pl.'s Reply Mem. at 5 (citing *United States v. Bonanno Organized Crime Family,* 683 F.Supp. 1411, 1451 (E.D.N.Y.1988), *aff'd,* 879 F.2d 20 (2d Cir.1989)). However, the Magistrate Judge did not interfere with the executive branch's role in granting or not granting immunity. Rather, he reasoned that given that the testimony sought to be compelled is protected by a marital privi-

lege, the only method by which the Government could extract the requested-for testimony was via use immunity.

5. Earlier, the Magistrate Judge had also noted that being compelled to testify in a deposition about private conversations with her husband after his arrest would remain problematic even if, at a later criminal proceeding, she invoked a marital privilege because "there could be fruits or other application of her testimony against her husband." Nov. 16th Tr. at 9.

magistrate's order. Under both the Rule and the Statute, the standard depends on whether the issue decided by the magistrate is dispositive. With respect to nondispositive matters, a district court shall "modify or set aside any portion of the magistrate's order found to be *clearly erroneous or contrary to law.*" Fed.R.Civ.P. 72(a) (emphasis added); *see also* 28 U.S.C. § 636(b)(1)(A) ("A judge of the court may reconsider any [nondispositive] pretrial matter ... where it has been shown that the magistrate's order is clearly erroneous or contrary to law."). As to matters deemed by Congress to be dispositive, a district court can engage in *de novo* review. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(B).

■ Matters involving pretrial discovery generally are considered nondispositive of the litigation and are subject to the more lenient "clearly erroneous" standard. *Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 100 (1990). The Supreme Court has stated that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (*quoted in Derthick v. Bassett–Walker Inc.,* No. 90 Civ. 5427, 1992 WL 249951 at *8 (S.D.N.Y. Sept. 23, 1992)). "[A] party seeking to overturn a discovery ruling [therefore] generally bears a 'heavy burden.'" *Com–Tech Assocs. v. Computer Assocs. Int'l, Inc.,* 753 F.Supp. 1078, 1099 (E.D.N.Y.1990), *aff'd,* 938 F.2d 1574 (2d Cir.1991). "Pursuant to this highly deferential standard of review, magistrates are afforded broad discretion in resolving discovery disputes and reversal is appropriate only if their discretion is abused." *Derthick,* 1992 WL 249951 at *8.

## II. *The Privilege Against Adverse Spousal Testimony*

■ Rule 501 of the Federal Rules of Evidence provides in relevant part that "[e]xcept as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Su-

preme Court pursuant to statutory authority, the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Federal common law recognizes two distinct forms of marital privilege: (1) the privilege against adverse spousal testimony which invests in the testifying witness the privilege of not being compelled to testify against one's spouse (*Trammel v. United States,* 445 U.S. 40, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980)); and (2) the confidential marital communications privilege which may be asserted by either spouse to bar the testimony of the other regarding marital communications made in confidence (*see, e.g., Wolfle v. United States,* 291 U.S. 7, 14, 54 S.Ct. 279, 280, 78 L.Ed. 617 (1934) ("The basis of the immunity given to communications between husband and wife is the protection of marital confidences, regarded as so essential to the preservation of the marital relationship as to outweigh the disadvantage to the administration of justice which the privilege entails.")).

In this dispute, the Government contends that federal common law recognizes that the privilege against adverse spousal testimony is only applicable in criminal actions and hence has no bearing on this civil forfeiture proceeding. Claimant, on the other hand, argues that because civil forfeiture actions are punitive in nature and are "quasi-criminal" the privilege should apply in this situation and hence Claimant cannot be compelled to testify against her husband in this action. In his November 16, 1993 ruling, the Magistrate Judge appeared to agree with the Government that this privilege is only available in criminal proceedings and that although there are constitutional protections offered claimants in civil forfeiture actions, those protections do not compel the conclusion that this marital privilege should be available in this civil forfeiture action. Nov. 16th Tr. at 8.

■ The Magistrate Judge's implicit determination that the privilege against adverse spousal testimony is only applicable in a criminal action is not clearly erroneous nor is it contrary to law. In *Ryan v. Commissioner of Internal Revenue,* 568 F.2d 531,

542–45 (7th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978), the Seventh Circuit determined that, pursuant to Federal Rule of Evidence 501 and based on the factual posture of the case, the privilege against adverse spousal testimony was not available in a civil tax action against the testifying spouse's husband. In so holding, the court noted that the proposed Federal Rule of Evidence 505 (which was not adopted by Congress) would have specifically made this privilege available in criminal actions only.[6] "Proposed Rule 505 does provide some guidance in interpreting the scope of privileges under Rule 501." *Id,* at 543. Although the policy considerations which support the privilege would seem to apply in both the criminal and civil context (*i.e.,* preserving the marriage), the court in *Ryan* noted that "[a] partial explanation [for the distinction] could be that the privilege has the greatest societal value in criminal cases because it encourages the preservation of a marriage that might assist the defendant spouse in his or her rehabilitation efforts. This rationale would not be applicable in a civil case." *Id.* at 544 (citation omitted). The Third Circuit, albeit in dicta, also pronounced that "[t]he crux of [the privilege against adverse spousal testimony] is that a person may not be forced to be a witness against his or her spouse in a criminal proceeding." *Appeal of Malfitano,* 633 F.2d 276, 277 (3d Cir.1980) (holding that there is no joint participation in crime exception to the privilege against adverse spousal testimony in a criminal action). This statement by the Third Circuit is in accord with a similar pronouncement by a leading authority on the federal rules of evidence. "The communications privilege may be asserted by either

spouse in both civil and criminal proceedings, while the testimonial privilege may be claimed only by a testifying spouse and is recognized only in criminal proceedings." 2 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* ¶ 505[5] at 505–41 (1993) (footnote omitted). Claimant, on the other hand, has not furnished any case in which the privilege against adverse spousal testimony was invoked in a civil context and hence it cannot be said that this prong of the Magistrate Judge's ruling is clearly erroneous or contrary to law.[7]

Claimant contends, however, that even if this marital privilege is reserved for criminal cases, because a civil forfeiture case is quasi-criminal and punitive in nature, the privilege should be applied. In support of this assertion, Claimant draws the court's attention to those cases where courts have granted *constitutional* rights to claimants in civil forfeiture proceedings. For example, in *Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), the Court held that the Eighth Amendment's prohibition against excessive fines protects a claimant in a civil forfeiture proceeding. The Court reasoned that because forfeiture pursuant to 21 U.S.C. § 881 penalizes the property owner, certain constitutional protections are appropriate. *Id.* at ——, 113 S.Ct. at 2810–12. The Court has also applied other constitutional protections to claimants in civil forfeiture proceedings based on a similar reasoning: Because statutory *in rem* actions punish owners of property, because of crimes committed by them and because the statutes specifically create an "innocent owner" defense, certain constitutional protections are appropriate. *See, e.g., United States v. Unites States Coin*

---

**6.** Proposed Rule 505 states that "[a]n accused in a criminal proceeding has a privilege to prevent his spouse from testifying against him."

**7.** It is worth noting, however, that the distinction between criminal and civil actions vis-a-vis the application of this marital privilege is dubious, notwithstanding the *Ryan* court's attempt at a reasoned justification. The policy behind the privilege—"a *natural repugnance* in every fair-minded person to compelling a wife or husband to be the means of the other's condemnation, and to compelling the culprit to the humiliation of being condemned by the words of his intimate life partner," 8 Wigmore, *Evidence* § 2228 (1961)

(emphasis in original)—would seem to be of equal force whether it is being applied in a criminal or civil context. This may explain why the evidence codes in some states do not restrict the privilege to criminal cases. *See, e.g.,* Ky. R.Evid. 504(a) ("The spouse of a party has a privilege to refuse to testify against the party as to events occurring after the date of their marriage."). However, Professor Wigmore notwithstanding, the distinction has been recognized and hence it was neither clearly erroneous nor contrary to law for the Magistrate Judge to implicitly recognize this distinction as well.

*and Currency,* 401 U.S. 715, 721–22, 91 S.Ct. 1041, 1044–45, 28 L.Ed.2d 434 (1971) (Fifth Amendment privilege may be invoked in statutory civil forfeiture proceeding because, in part, the forfeiture statutes "are intended to impose a penalty only upon those who are significantly involved in a criminal enterprise."). *Cf. United States v. James Daniel Good Real Property,* —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) (Due Process Clause requires prior notice and a hearing, in the absence of exigent circumstances, prior to the seizure of claimant's real property).

Claimant, however, relies primarily on the following statement in *Austin* for the proposition that the privilege against adverse spousal testimony is appropriate in a civil forfeiture action pursuant to 21 U.S.C. § 881:

> And, of course, even those protections associated with criminal cases may apply to a civil forfeiture proceeding if it is so punitive that the proceeding must reasonably be considered criminal. See *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963); *Ward, supra.*

*Austin,* —— U.S. at —— n. 4, 113 S.Ct. at 2805 n. 4. Claimant argues, therefore, that because "[t]he threatened forfeiture of the Camiola family home is so punitive as to be considered criminal punishment," Cl.'s Mem. at 8–9, this marital privilege should apply.

The Magistrate Judge, however, rejected the argument that the quasi-criminal nature of a civil forfeiture proceeding mandated the application of this marital privilege because the "argument applies much more to an invocation of a privilege that Mrs. Camiola would assert to protect *herself* from some kind of punitive component[.]" Nov. 16th Tr. at 8 (emphasis added). This determination is not clearly erroneous nor is it contrary to law. In *Kennedy,* for example, the Court held unconstitutional a statute which automatically deprived a defendant in a civil action of his citizenship without any prior judicial or administrative hearing; because the action was penal in nature the defendant must be accorded his or her Fifth and Sixth Amendment rights. In *United States v. Ward,* 448

U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980), the Court held that a civil penalty for an oil spill does not trigger all protections afforded by the constitution, including the Fifth Amendment, because the penalty was civil and the proceeding was not quasi-criminal. In this case, the privilege which Claimant seeks to invoke—the privilege against adverse spousal testimony—is not a constitutionally protected right designed to protect *her* from the punitive aspects of a civil forfeiture proceeding; rather, it is designed to protect her *husband* from any future criminal prosecutions.[8] This analysis is supported by those courts which have held that there is no constitutional underpinning to the marital communications privilege. *United States v. Lefkowitz,* 618 F.2d 1313, 1319 (9th Cir.), *cert. denied,* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 27 (1980); *LaRoche v. Wainwright,* 599 F.2d 722, 726 (5th Cir.1979); *United States v. Doe,* 478 F.2d 194, 195 (1st Cir. 1973). *See also Port v. Heard,* 764 F.2d 423, 430 (5th Cir.1985) ("[T]he marital privilege has never been placed on a constitutional footing. While its origins are somewhat obscure, we know that the marital privilege is bequeathed to us by the long evolution of the common law, not by constitutional adjudication.") (dicta). The Magistrate's analysis, therefore, was sound and hence was neither clearly erroneous nor contrary to law.

### III. *The Confidential Marital Communications Privilege*

There is no dispute between the parties that the confidential marital communications privilege allows either Claimant or her husband to block the testimony of the other regarding confidential marital communications, absent certain exceptions. In this case, the Claimant has voluntarily chosen not to divulge communications between her and her husband following his arrest in 1990 regarding the proposed drug sale initiated by an undercover agent or the events leading up to his arrest.

■ There are three prerequisites to the assertion of this marital privilege: (1) a valid

---

8. Claimant concedes that "[i]n this case, Mrs. Camiola has asserted the marital privilege in order to protect her husband from possible criminal liability." Cl.'s Mem. at 10.

marriage at the time of the communication, *United States v. Lustig,* 555 F.2d 737, 747–48 (9th Cir.1977) (privilege claim denied in part because common law marriage of defendant is not recognized as valid under state law), *cert. denied,* 434 U.S. 926, 98 S.Ct. 408, 54 L.Ed.2d 285 (1978); (2) the privilege "applies only to utterances or expressions intended by one spouse to convey a message to the other," *id.* at 748; and (3) the communication must have been made in confidence, which is presumed, *Pereira v. United States,* 347 U.S. 1, 6, 74 S.Ct. 358, 361–62, 98 L.Ed. 435 (1954). In this case, the Government does not seriously contest any of the prerequisites to the application of the privilege in this appeal but argues instead that (i) Claimant waived the privilege by asserting an "innocent owner" defense; and (ii) the joint participation in crime exception is applicable because Claimant was testifying as to a planned marijuana sale involving her husband. The Magistrate Judge rejected both of these assertions without discussion and upheld his original determination that Claimant cannot be compelled to testify about conversations she had with her husband following his arrest in 1990.

### A. *Innocent Owner Defense as Waiver*

■ The Government contends that because Claimant has asserted an "innocent owner" defense she has put in issue her knowledge of her husband's drug dealing and has therefore waived the confidential marital communications privilege. The Government has not come forward with any authority for the proposition that an innocent owner defense is a waiver of the marital communications privilege in a civil forfeiture action. Instead, it argues by analogy that, "[j]ust as a plaintiff in a personal injury action waives the physician-patient privilege by putting his or her physical condition at issue, so too the confidential marital communications privilege is waived with respect to communications about the drug trafficking activities of one spouse when the other spouse is claiming a lack of knowledge of or consent to those activities." Pl.'s Mem. at 6–7. Plaintiff relies on *Hoenig v. Westphal,* 52 N.Y.2d 605, 608–09, 422 N.E.2d 491, 492, 439 N.Y.S.2d 831, 832 (1981) ("Of course, plaintiffs do not

and may not claim the physician-patient privilege, for that privilege was waived by the commencement of these personal injury actions in which physical condition was affirmatively put in issue.").

Plaintiff's argument is persuasive. Although research has not uncovered a case in which a court has held that the invocation of the innocent owner defense impliedly waives the confidential marital communications privilege, the doctrine of implied waiver is applicable to this action for the following reasons. In *Hearn v. Rhay,* 68 F.R.D. 574, 581 (E.D.Wash.1975), the court outlined the factors to consider when determining whether an affirmative act by a party seeking to invoke a common law privilege has impliedly waived the privilege. The court's observations are worth quoting at length:

All of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party. The factors common to each exception may be summarized as follows: (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus, where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct.

Applying these factors to this case, the following is to be noted. First, had Mrs. Camiola not asserted the innocent owner defense, she would never have been asked questions regarding conversations she had with her husband and thus would not have had to have invoked the privilege. In this action, the Government asserts that the Property was purchased in connection with Mr. Camiola's drug activity prior to his arrest in 1990. The Claimant, on the other

hand, asserts that the Property was purchased with the proceeds of a sale of her mother-in-law's home and a bank mortgage and that she had no knowledge of her husband's illegal drug activities prior to his 1990 arrest. The Claimant is therefore arguing, by implication, that she never had any conversations with her husband prior to his arrest in 1990 regarding any drug activity committed by him. This position invites, and indeed compels, the Government to make inquiries regarding *any* conversations Mrs. Camiola might have had with her husband regarding his drug activities—both before and after his arrest in 1990—and her alleged knowledge of them. Therefore, the assertion of the confidential marital communications privilege was a result of an affirmative act (the assertion of the innocent owner defense) by the asserting party.

Second, through this affirmative act of asserting the innocent owner defense, the Claimant has put her confidential communications with her husband at issue in the case, thus making it relevant.[9] The Government cannot explore the extent to which the Claimant had knowledge of her husband's drug activity if it is not permitted to ask her questions regarding conversations she had with her husband. And third, application of the confidential marital communications privilege would deny the Government access to information vital to its cause of action; *i.e.,* establishing that Mrs. Camiola is not, in fact, an innocent owner of the Property. Therefore, because the Magistrate Judge's order implicitly rejected the contention that the Claimant impliedly waived the privilege, his order is clearly erroneous and contrary to law and must, therefore, be reversed.

### B. *Waiver Via Claimant's Earlier Testimony*

■ It is undisputed that prior to the point in time when Claimant's attorney in-

structed her not to answer any questions regarding conversations she had with her husband after his arrest, Claimant had volunteered private conversations she had had with her husband before his arrest. Although not addressed by the Government in its appeal, nor discussed by the Magistrate Judge in his order, this Court believes that the issue is dispositive to the present appeal. That is, by discussing marital communications she had with her husband prior to his arrest in 1990, Claimant has waived the confidential marital communications privilege and hence the Magistrate Judge's order is erroneous and must be reversed.

During her three days of deposition testimony, Mrs. Camiola discussed conversations she had with her husband prior to his arrest which would have been privileged had she chosen to assert the privilege.[10] For example, she voluntarily responded to questions concerning the abuse she received from her husband:

Q. What were you fighting about in the instances where he physically abused you?

A. When I didn't cook and I didn't put bread on the table, because he used to go out all the time, I used to complain to him, "Why do you go out so much?" And he said it was none of my business.

Camiola Dep. at 100. Mrs. Camiola also testified as follows:

I used to tell him, "John, you are married, you shouldn't be going out." And he said he is away on business, and then he would come with lipstick and he would come the next day sometimes. I didn't even know where he was.

Camiola Dep. at 104. Mrs. Camiola spoke freely about the changes in her relationship

---

9. In *Rhay*, the court was also faced with the assertion of an affirmative defense (qualified immunity) as it related to the invocation of a common law privilege (attorney-client). The court concluded that the "by asserting their qualified immunity as an affirmative defense, defendants impliedly waived the right to assert the attorney-client privilege with respect to any legal advice ... that relate[s] to the issues of malice toward plaintiff...." *Id.* at 583.

10. This point is conceded by the Claimant. Cl.'s Supp.Mem. at 5 ("[D]uring three days of deposition, Mrs. Camiola willingly answered questions about conversations with her husband *prior* to his 1990 arrest. She willingly testified to her observations, experiences, thoughts, and knowledge about her husband and his activities.") (emphasis in original).

with Mr. Camiola: "Well, after he stopped hitting me, I got pregnant with Anthony and he changed completely." Camiola Dep. at 104. Mrs. Camiola also recounted other conversations she had with her husband prior to his arrest in 1990:

> And when I was in the beauty parlor, I called my mom to see how she was doing and she told, "Lydia, I just had a dream with your dad telling me that your husband is going to get arrested." And I got very scared and I beeped my husband in South Carolina and then be beeped me back.
>
> And he said to me, "Why are you beeping?"
>
> And I said, "You know, my mom had a dream that you are going to be in trouble," I said, "Whatever you are doing, you stop it, you come up."
>
> He said, "Always—your mom always doesn't like me."

Camiola Dep. at 114.

As a matter of law, it is well-established that once a privilege is waived it cannot be selectively asserted following the waiver and hence Mrs. Camiola cannot waive the confidential marital communications privilege for pre-arrest conversations but assert it for post-arrest conversations. "As Wigmore states, the confidential marital communications privilege may be waived by 'some act of testimony which in fairness places the person in a position not to object to further disclosure.'" *United States v. Brown,* 634 F.2d 819, 829 (1st Cir.1981) (quoting 8 J. Wigmore, *Evidence* § 2340 at 671 (1961)).

In the Fifth Amendment context, for example, in *Klein v. Harris,* 667 F.2d 274 (2d Cir.1981), a witness testified for the state, in a criminal action against the defendant, that he (the witness) had held the victim while the defendant stabbed her. This witness then recanted and told the defendant's attorney that he had been pressured by the assistant district attorney and had lied while on the stand. When the witness was recalled, he asserted his Fifth Amendment privilege when asked about the events of the night of the killing. The Second Circuit held that the trial judge's refusal to either compel the witness to answer the question or strike the witness's earlier testimony was error warranting a granting of the defendant's habeas corpus petition.

The Second Circuit held that the witness's original testimony was a waiver of his Fifth Amendment privilege because (i) the witness's prior statements created a significant likelihood that the finder of fact will be left with and prone to rely on a distorted view of the truth; and (ii) the witness had reason to know that his prior statements would be interpreted as a waiver of the Fifth Amendment's privilege against self-incrimination. *Id.* at 287–89. Quoting *Rogers v. United States,* 340 U.S. 367, 371, 71 S.Ct. 438, 441, 95 L.Ed. 344 (1951) ("often described as the leading case on the subject of testimonial waiver"), the Second Circuit stated that "[t]o uphold a claim of privilege in this case, would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony," because "[o]nce [the testifying witness'] recantation occurred, it was plain that his prior testimony, which was devastating to [the defendant's] case, had created a significant likelihood that the jury had been left with, and thus was prone to rely on, a distorted view of the truth." *Harris,* 667 F.2d at 288. The court also reasoned that it was proper to infer a waiver from the testifying witness's prior statements because his statements were both "testimonial" (*i.e.,* voluntarily made under oath in the context of the same judicial proceeding) and "incriminating" (*i.e.,* the statements did not deal with matters collateral to the events surrounding the commission of the crime but directly inculpated the witness on the charges at issue). The court therefore concluded as follows:

> Accordingly, we hold that [the testifying witness], by testifying freely about the circumstances of the crime when he first took the stand, waived any fifth amendment privilege he might otherwise have been entitled to invoke to avoid testifying concerning [the victim's] murder. The state trial judge thus erred in allowing [the testifying witness] to invoke the fifth amendment's privilege against self-incrimination when he was recalled to the stand.

*Id.* at 289. *See also In re Bergsieker,* 30 B.R. 757, 759 (W.D.Mo.Bankr.1983) ("It is well settled that a witness, in invoking the Fifth Amendment privilege against self-incrimination, cannot be permitted to 'select any stopping place in the testimony.' ").

It is conceded that the Fifth Amendment's privilege against self-incrimination differs from the confidential marital communications privilege in many ways, not the least of which is that the Fifth Amendment privilege is constitutional and designed to protect the witness, whereas the confidential marital communications privilege is not constitutional and is designed to protect the marriage and, in this case, the non-testifying spouse. However, application of the factors discussed in *Harris* is instructive. Here, allowing Mrs. Camiola to discuss conversations with her husband before his arrest in 1990, but not after, will lead to a distortion of the truth because the fact finder will only be left with those conversations which Mrs. Camiola chooses to discuss, thus denying the Government the opportunity to learn if she was, in fact, an innocent owner.[11] Second, some of the pre–1990 arrest conversations between Mrs. Camiola and her husband are not collateral to the central issue in the case; namely, the bona fides of Mrs. Camiola's ownership of the res. *E.g.,* Camiola Dep. at 201 ("Q. Did your husband [in 1984] maintain to you that he had not been involved in the drug dealing? A. Correct. He told me that he was just involved in lending money to them."); *id.* at 202 (following Mr. Camiola's first arrest for drug trafficking, Mrs. Camiola testified that "[h]e said that he only financed money for them, that they were lying about the drug dealing that he was doing."); *id.* at 203 ("I don't even think we ever talked about drugs. I always used to tell him, you know, that there are so many children on drugs and we had children, and we had to watch for our kids not to get involved in drugs, but never business. Is that what you want?").

In opposition, Claimant argues that her pre-arrest conversations with her husband—which she concedes she willingly divulged during her deposition—should not constitute a blanket waiver of the confidential marital communications privilege because (i) she did not "knowingly" waive her privilege as to post-arrest conversations and never intended to expose her husband to the possibility of additional penal sanctions; (ii) in order to bolster her innocent owner defense she had no choice but to waive the privilege for pre-arrest conversations (since the Government's case is based upon events occurring before her husband's arrest); and (iii) the pre-arrest conversations were concerned with "routine matters" and "sensitive personal matters" unrelated to the subject matter of the post-arrest conversations. Cl.'s Supp.Mem. at 6. Two observations are in order. First, there can be no doubt but that Claimant did, in fact, "knowingly" waive the privilege. She willingly and with candor spoke about private and sensitive matters between her and her husband. Second, Claimant cites no authority for the proposition that the confidential marital communications privilege is, or should be, premised upon the subject matter of the communications being divulged or the reasons for their divulgence. Rather, it is a common law doctrine designed to protect the marriage. In this case, the testifying spouse has made a tactical decision to place the marriage at risk by divulging confidential communications in order to champion a different cause (here, the innocent owner defense). The consequence of this decision is to waive the privilege, irrespective of the contents of, or reasons for, the waiver of pre-arrest confidential communications.

In sum, the pre–1990 arrest conversations with her husband—voluntarily offered by Claimant without any objection by her attorney—waived the confidential marital communications privilege, and hence Mrs. Camiola cannot be permitted "to select any stopping place in the testimony." *Rogers v. United States,* 340 U.S. 367, 371, 71 S.Ct. 438, 441, 95 L.Ed. 344 (1951). Because the Magistrate Judge's order would have allowed her to do

---

11. As the Government points out, "[i]f she is permitted to shield some of these conversations [concerning Mr. Camiola's drug dealing] from discovery, it would unfairly deny the government an opportunity to cross examine her on her claim that she did not learn of his drug dealing until after his 1990 arrest." Pl.'s Supp.Mem. at 3.

just that, it is clearly erroneous and contrary to law and hence must be reversed.

## C. *The Joint Crime Exception*

The Second Circuit recognized the joint crime exception to the marital communications privilege in *United States v. Estes,* 793 F.2d 465 (2d Cir.1986). In *Estes,* the defendant's wife willingly testified before the grand jury and at trial that defendant had returned home one day carrying a bag full of money. She testified that defendant told her that he had stolen the money and that she helped him count, hide, and launder the money. The district court held that none of the wife's testimony should be excluded because "confidential marital communications concerning ongoing criminal activity are not protected by the privilege." *Id.* at 466 (quoting *United States v. Estes,* 609 F.Supp. 564, 568 (D.Vt.1985)). The Court of Appeals held that the exception did not apply to the testimony regarding the husband's initial disclosure of the theft and remanded for a new trial, stating,

> At that time, the theft of the money had been completed and [the wife's] involvement could be only as an accessory after the fact. [The wife] could not become such an accessory until she knew that the theft had taken place. The communication to her of that knowledge was a necessary precursor to her involvement and therefore could not have been made as part of an ongoing joint criminal activity. Under the normal evidentiary rule applicable to confidential marital communications, this portion of [the wife's] testimony should not have been admitted.

*Id.* at 466 (citations omitted). The court also stated that "the greater public good will result from permitting the spouse of an accused to testify willingly concerning their joint criminal activities than would come from permitting the accused to erect a roadblock against the search for truth." *Id.* at 468.

"Every circuit that has considered the partners in crime exception to the marital confidential communications privilege has adopted it in one form or another." *United States v. Evans,* 966 F.2d 398, 401 (8th Cir.),

*cert. denied,* —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992). However, as the Sixth Circuit recognized, "[o]nly where spouses engage in conversations regarding joint ongoing or *future patently illegal activity* does the public's interest in discovery the truth about criminal activity outweigh the public's interest in protecting the privacy of marriage." *United States v. Sims,* 755 F.2d 1239, 1243 (6th Cir.), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3533, 87 L.Ed.2d 656 (1985) (emphasis added).

In situations where the exception has been applied, the testifying spouse has been actively participating in or planning a current or ongoing criminal activity. For example, in *Estes,* the testifying spouse helped the defendant hide, count, and launder proceeds from what she knew was a robbery. In *Evans,* the spouse testified that she was personally involved in the growing and selling of marijuana with her husband, including the purchasing of the potting soil for the operation; driving her husband on two or three occasions when he was selling the marijuana; and helping to dry the marijuana in the microwave oven on five or six occasions. In *United States v. Neal,* 743 F.2d 1441 (10th Cir.1984), *cert. denied,* 470 U.S. 1086, 105 S.Ct. 1848, 85 L.Ed.2d 146 (1985), relied upon by the Government, the testifying spouse helped to, among other things, count, hide, and spend the stolen money. The court noted that "conversations between husband and wife about crimes in which they conspire or participate or, after the fact, participate in, are not privileged marital communications for the purpose of protection as confidential martial communications." *Id.* at 1447.

The Magistrate Judge implicitly rejected the Government's assertion that the joint participation in crime exception is applicable in this case. His determination is, however, clearly erroneous and contrary to law because, in this case, the record reveals that Claimant was planning to participate with her husband in the undercover agent's plan to sell drugs in order to raise money for Mr. Camiola's defense.

 When asked if she understood that the sale of marijuana was contemplated,

Claimant stated that *"Yes,* because my husband had told me and also Carlos—." Camiola Dep. at 422 (emphasis added). Like the factual situations noted above, this answer establishes that the Claimant was planning on participating with her spouse in an ongoing criminal activity; *i.e.,* a conspiracy to sell drugs. The Government contends that this answer establishes that "[Claimant] readily admitted to participating in these conversations, and indicated that her husband had also participated, [and therefore] there is a basis for finding that the participant in crime exception applies." Pl.'s Reply Mem. at 6. I agree. Claimant's answer establishes that she entertained and agreed to the undercover agent's proposition and, pursuant to 21 U.S.C. § 846, "[a]ny person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both...." Pursuant to 21 U.S.C. § 846, an agreement between two or more persons to commit the crime of drug trafficking—even without an act in furtherance of the conspiracy—constitutes an offense of conspiracy. *United States v. Knuckles,* 581 F.2d 305, 311 (2d Cir.) ("Section 846 of Title 21 does not require proof of any overt act."), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978). Therefore, Claimant's deposition answer establishes that she was participating with her husband in the crime of conspiracy to distribute illegal drugs.

Because the deposition answer establishes that Claimant was participating with her husband in an ongoing or planned criminal enterprise (*i.e.,* a conspiracy to sell drugs), the joint crime exception applies in this case and hence the Magistrate Judge's implicit rejection of it was clearly erroneous and contrary to law.

## IV. *Adverse Inference*

During oral argument the question was raised as to whether a trier of fact could draw an adverse inference from Mrs. Camiola's invocation of the marital privilege in this action. Given the fact that this court has now determined that Mrs. Camiola has waived the confidential marital communications privilege, and must therefore answer questions regarding post-arrest conversa-

tions with her husband, the point is now moot. However, because the parties have addressed the issue in their supplemental memoranda, the court will comment briefly on what would have been permissible had the court affirmed the Magistrate Judge's order.

The Government contends, correctly, that in the Fifth Amendment context, in civil proceedings, the jury may draw adverse inferences from the testifying spouse's invocation of the privilege. *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976) ("Our conclusion is consistent with the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them; the Amendment 'does not preclude the inference where the privilege is claimed by a *party to a civil cause.*'" (quoting 8 J. Wigmore, *Evidence* 439 (1961) (emphasis in original). The Government therefore argues that, by analogy, the same rule should apply in the marital privilege context in civil cases because "[i]t would defy logic to award greater protection to a person's spouse by means of the marital privilege, a common law privilege, than that afforded to a person herself under a constitutional privilege." Pl.'s Supp.Mem. at 5.

In *United States v. Chapman,* 866 F.2d 1326 (11th Cir.1989), *cert. denied,* 493 U.S. 932, 110 S.Ct. 321, 107 L.Ed.2d 312 (1989), the defendant's wife told the police during its investigation that her husband had robbed a bank, but after calling her to the stand she refused to testify, invoking the privilege against adverse spousal testimony. During his summation, the prosecutor commented that while the wife is free not to testify against her husband, "she is also entitled to testify for him." *Id.* at 1334 n. 3. On appeal, the defendant argued that the prosecutor's comments created an unfair inference and thus warranted reversal. The Eleventh Circuit, however, held that the comment did not rise to the level of plain error because the prosecutor's statement was "brief and unembellished and did not on its face communicate the message that Mrs. Chapman's refusal to testify implies [her husband's] guilt." *Id.* This conclusion by the court necessarily implies that had the jury been led to believe that the defendant was guilty *because of* the

testifying spouse's invocation of the privilege against adverse spousal testimony, reversal would have been appropriate. Such was the conclusion in *United States v. Pariente*, 558 F.2d 1186, 1189–90 (5th Cir.1977) (where evidence of guilt was circumstantial and prosecutor commented during his summation that defendant's wife had refused to testify on his behalf, conviction is reversed). *Cf. United States v. Price*, 573 F.2d 356, 365 n. 25 (5th Cir.1978) (where evidence is substantial but trial court allows the prosecution to comment in final argument on the defendant's failure to call his wife to testify, prosecutor's comment does not merit reversal). These cases stand for the proposition that, in certain circumstances, it is improper for a trial court *in a criminal case* to instruct a jury that it may draw an adverse inference from a testifying spouse's decision to invoke a marital privilege.[12] Professor Wright paints with a broader brush: "Opportunity should be given to claim the benefits of the rule [against adverse spousal testimony] in the absence of the jury, *and no adverse inference can be drawn or comment permitted on the refusal of the spouse to testify.*" Charles A. Wright *Federal Practice and Procedure: Criminal 2d* § 405 at 435 (1982) (emphasis added).

The cases discussed above are criminal matters in which the guilt or innocence of a defendant depends, to a certain degree, on the silence of his or her spouse. It follows, therefore, that absent substantial evidence implicating the defendant an adverse inference may not be drawn. This, however, is a civil action. The constitutional protections afforded defendants in a criminal action are not generally implicated in a civil action; therefore, as noted above, the uses of personal privileges differ. No adverse inference, for example, can be drawn from a defendant's invocation of the Fifth Amendment in a criminal action, but such inferences are allowed in a civil action. Likewise, the privilege against adverse spousal testimony, while

proper in a criminal action, is not allowed in a civil action. The privileges that are deemed proper in civil forfeiture actions, *see supra*, are privileges which are asserted in order to protect the *defendant* from punitive action. It follows, therefore, that because a claimant would not be asserting a marital privilege in order to protect him or herself in a civil forfeiture action—and because an adverse inference may be drawn in the Fifth Amendment context (which is based on the Constitution and not the common law)— there is no reason why an adverse inference could not be drawn from the invocation of the confidential marital communications privilege.

## CONCLUSION

The Magistrate Judge did not explicitly state the basis for his determination that Claimant cannot be compelled to discuss confidential communications she had with her husband following his arrest in 1990. He appeared to agree with the Government that the privilege against adverse spousal testimony does not apply because although a civil forfeiture action is quasi-criminal in nature, only constitutional protections which would protect Claimant from punishment are available. Therefore, his decision must have, by implication, been based on the determination that the Government was attempting to force Claimant to reveal marital confidences made after Mr. Camiola's arrest in 1990. Because the Government has sustained its burden in establishing that the exceptions to the confidential marital communications privilege apply, the Magistrate Judge's ruling is clearly erroneous and contrary to law and hence it must be reversed.

SO ORDERED.

12. In its Supplemental Memorandum, the Government suggests that for purposes of determining whether an adverse inference can be drawn from a testifying spouse's invocation of a marital privilege, a distinction should be made between the privilege against adverse spousal testimony and the confidential marital communications privilege. There is, however, no reasoned justification for drawing such a distinction. In the case of either privilege, the opposing party is requesting that the trier of fact draw an adverse inference from the testifying spouse's silence. The *cause* of the silence—*i.e.,* a decision not to testify against one's spouse, or a decision not to divulge marital confidences—is irrelevant. Rather, the inquiry is what inferences, if any, one may draw from that silence.