**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**PREMISES KNOWN AS 281 SYOSSET WOODBURY ROAD, WOODBURY, NEW YORK, A Parcel of Real Property and All Appurtenances Thereto, Lying in Nassau County, New York, Said Property Being Titled in the Name of Lydia Camiola, Defendant–Appellant.**

No. 34, Docket 94–6308.

United States Court of Appeals, Second Circuit.

Argued Sept. 1, 1995.

Decided Dec. 13, 1995.

Linda Myers, Brooklyn, New York (BLS Legal Services Corp., Minna J. Kotkin, on the brief), for Defendant–Appellant.

Sarah J. Lum, Assistant United States Attorney, Brooklyn, New York (Zachary W. Carter, United States Attorney, Deborah B. Zwany, Assistant United States Attorney, Arthur P. Hui, Assistant United States Attorney, on the brief), for Plaintiff–Appellee.

Before: MINER and CALABRESI, Circuit Judges, POLLACK, District Judge.[1]

CALABRESI, Circuit Judge:

The wife of a convicted drug dealer seeks to distance herself from her husband's activities by asserting an innocent owner defense in a forfeiture proceeding against the family home. At the same time, she asserts the right to protect the harmony and intimacy of her marriage by invoking the testimonial privileges that allow a husband and wife to limit their testimony against each other. Her claims are ultimately unsuccessful, but they force us to explore the justifications for the common law marital privileges as they operate in the context of one kind of modern family.

## BACKGROUND

This case grows out of the drug trafficking activities of John Rosario Camiola, who in 1990 pleaded guilty to, among other things, possession of cocaine with intent to distribute.[2] In his plea agreement, Mr. Camiola agreed to cooperate with the federal government's investigation of other drug traffickers, and further agreed to surrender all of his assets acquired as a result of illegal drug trafficking. The plea agreement also provided that the parties would litigate the appropriateness of the forfeiture of a parcel of real property located at 281 Syosset Road and held in the name of Mr. Camiola's wife, Lydia Camiola. The government subsequently initiated civil forfeiture proceedings against the property, claiming that Mr. Camiola had conducted meetings relating to drug trafficking in the house and had stored drugs on the premises, both in violation of 21 U.S.C. § 881(a)(7), and further that Mr. Camiola had offered the property as a thing of value in exchange for drugs, in violation of 21 U.S.C. § 881(a)(6).

Mrs. Camiola asserted a defense of innocent ownership, pursuant to 21 U.S.C. § 881(a)(7), claiming that she had not known of her husband's illegal activities between his release from prison in 1987 and his second arrest in 1990. During three days of depositions, and in an effort to establish that she had not known of his continued involvement in drug trafficking, Mrs. Camiola testified regarding conversations she had had with

---

1. The Honorable Milton Pollack, Senior United States District Judge for the Southern District of New York, sitting by designation.

2. This was Mr. Camiola's second arrest for drug trafficking. He had spent two years in jail on federal drug charges from 1984 to 1986. In connection with the earlier arrest, a civil forfeiture proceeding, pursuant to 21 U.S.C. § 881(a)(6), was brought against the property at Syosset Woodbury Road that is the subject of this case. That proceeding was dismissed by stipulation in 1986.

her husband prior to his arrest. When the government questioned her about conversations between her and her husband that took place immediately following his arrest, Mrs. Camiola's lawyer advised her to assert "marital privilege" and to refuse to answer. Ms. Camiola did so, and the government asked the Magistrate Judge to compel her testimony.

After conducting two hearings on the applicability of the marital privileges, Magistrate Judge Stephen Gold determined that the privilege against adverse spousal testimony did not apply in this case, but—according to the District Court—concluded that the privilege protecting confidential marital communications was on point. Seemingly on this basis, he held that Mrs. Camiola could not be required to testify concerning conversations that she had with her husband after his arrest. The government appealed to the District Court, which reversed the decision of the Magistrate Judge and ordered Mrs. Camiola to testify. *See United States v. 281 Syosset Woodbury Rd.*, 862 F.Supp. 847, 848 (E.D.N.Y.1994).

The District Court first addressed the privilege against adverse spousal testimony. The court found that the Magistrate Judge did not err when he determined that this privilege is available only in a criminal context. *Id.* at 851–52. The District Court also affirmed the Magistrate Judge's conclusion that the adverse spousal testimony privilege should not be extended to "quasi-criminal" civil forfeiture proceedings. *Id.* at 852–53. The District Court noted that the Magistrate Judge's decision on the application of this privilege in a forfeiture proceeding was particularly "sound" because "the privilege which the Claimant seeks to invoke ... is not a constitutionally protected right designed to protect *her* from the punitive aspects of a civil forfeiture proceeding...." *Id.* at 853 (emphasis in original).

Next, the District Court considered the application of the privilege protecting confidential marital communications, which operates much like other confidentiality rules— *e.g.*, the attorney/client privilege. As such, it allows either spouse to compel the non-disclosure of the substance of confidential communications between the two. In reversing the Magistrate Judge, the District Court held that the confidential communications privilege is unavailable to any spouse who asserts an innocent owner defense in a forfeiture proceeding arising out of the other spouse's activities. *Id.* at 854. The court analogized the assertion of the innocent owner defense to a medical malpractice suit in which the doctor-patient privilege is deemed inapplicable because the patient, by making the confidential relationship the subject of a lawsuit, has, in effect, waived the privilege. *Id.* at 854–55.

The District Court concluded, moreover, that Mrs. Camiola had also, and more specifically, waived the confidential communications privilege with respect to the post-arrest marital conversations by voluntarily testifying about the pre-arrest conversations that she had had with her husband. *Id.* at 855–56. The District Court found that allowing Mrs. Camiola to reveal selectively the contents of confidential conversations would handicap the government's case so severely as to be unfair. *Id.* at 856–58.

Even if Mrs. Camiola had not waived her confidential communications privilege, the District Court indicated that the joint crime exception—which allows a willing witness to violate the confidence of her or his spouse when the partners have jointly planned or participated in criminal activity, *see United States v. Estes*, 793 F.2d 465 (2d Cir.1986)— was applicable here because the testimony that Mrs. Camiola had started to present when her attorney advised her to invoke the marital privileges indicated that she had been planning to engage in a drug sale organized by her husband in order to finance his defense. *See 281 Syosset Woodbury Rd.*, 862 F.Supp. at 858–59.

Finally, the District Court addressed the government's argument that if Mrs. Camiola were permitted to invoke either of the marital privileges, the trier of fact should be able to draw adverse inferences from her decision not to testify. The court concluded that "because a claimant would not be asserting a marital privilege in order to protect him or herself in a civil forfeiture action—and because an adverse inference may be drawn in

the Fifth Amendment context [in a civil trial]—there is no reason why an adverse inference could not be drawn from the invocation" of a marital privilege in a civil forfeiture proceeding. *Id.* at 860.

## DISCUSSION

 The common law rules of testimonial privilege recognize two distinct marital privileges. The adverse spousal testimony privilege permits an individual to refuse to testify in a criminal proceeding against her or his spouse. This privilege rests on the notion that a husband and wife should be able to trust each other completely, and that marriage is a sanctuary. The privilege is described as being "broadly aimed at protecting marital harmony." *In re Grand Jury Subpoena United States,* 755 F.2d 1022, 1027 (2d Cir.1985), *vacated on other grounds sub nom United States v. Koecher,* 475 U.S. 133, 106 S.Ct. 1253, 89 L.Ed.2d 103 (1986). The second marital privilege—the confidential marital communications privilege—is narrower than the adverse spousal testimony privilege and seeks only "to protect the intimacy of private marital communications," *id.,* but it can be invoked by either spouse to prevent the revelation of such communications.

Mrs. Camiola argues that her testimony concerning post-arrest conversations between Mr. Camiola and herself is protected by both of these privileges. We will consider each in turn.

*Adverse Spousal Testimony Privilege*

The adverse spousal testimony privilege has traditionally been limited to criminal cases. *See Appeal of Malfitano,* 633 F.2d 276, 277 (3d Cir.1980); *Ryan v. Commissioner of Internal Revenue,* 568 F.2d 531, 542–45 (7th Cir.1977), *cert. denied,* 439 U.S. 820, 99 S.Ct. 84, 58 L.Ed.2d 111 (1978); 2 Jack B. Weinstein et al., *Weinstein's Evidence* ¶ 505[05], at 505–41 (1995); *Developments in the Law—Privileged Communications,* 98 Harv.L.Rev. 1450, 1570 (1985). Mrs. Camiola argues that we should extend the privilege to a civil forfeiture dispute because forfeiture is "quasi-criminal."

She is correct that many protections typically reserved for criminal trials have been extended to civil forfeiture proceedings. *See, e.g., Austin v. United States,* —— U.S. ——, —— – ——, 113 S.Ct. 2801, 2804–06, 125 L.Ed.2d 488 (1993) (Eighth Amendment's Excessive Fines Clause); *United States v. United States Coin & Currency,* 401 U.S. 715, 717–22, 91 S.Ct. 1041, 1042–45, 28 L.Ed.2d 434 (1971) (Fifth Amendment's Self-Incrimination Clause); *Boyd v. United States,* 116 U.S. 616, 633–34, 6 S.Ct. 524, 533–34, 29 L.Ed. 746 (1886) (Fourth Amendment's Search and Seizure Clause); *United States v. All Assets of G.P.S. Automotive Corp.,* 66 F.3d 483, 489–93 (2d Cir.1995) (Fifth Amendment's Double Jeopardy Clause and Eighth Amendment's Excessive Fines Clause); *United States v. $405,089.23 U.S. Currency,* 33 F.3d 1210, 1220–22 (9th Cir. 1994) (Fifth Amendment's Double Jeopardy Clause). And, in an appropriate case, this or some other court may well have to consider whether the policies that have led to the extension of some constitutional protections to civil forfeitures would also justify the invocation of the adverse spousal testimony privilege in forfeiture actions.

 On the facts presented here, however, we decline to reach that question. The adverse spousal testimony privilege is not applicable except in proceedings where one spouse is a party and the other spouse is called to testify. That is not the situation before us.

The adverse spousal testimony privilege is justified by "its perceived role in fostering the harmony and sanctity of the marriage relationship," *Trammel v. United States,* 445 U.S. 40, 44, 100 S.Ct. 906, 909, 63 L.Ed.2d 186 (1980), and is designed to protect that marital harmony by ensuring that a husband and wife will not be forced to bear witness against each other. Until the Supreme Court's decision in *Trammel,* the privilege rested with the accused spouse—that is, a defendant could prevent even willingly offered testimony from his or her spouse. In *Trammel,* the Court modified the rule "so that the witness spouse alone has a privilege to refuse to testify adversely." *Id.* at 53, 100 S.Ct. at 914. Nothing in that opinion, however, changed the underlying idea of the privilege—that it applies only to testimony that

"disfavors the other spouse's *legal interests in the very case* in which the testimony is offered." 8 J. Wigmore, Evidence § 2234, at 231 (McNaughton rev. ed. 1961) (emphasis in original); *see also In re Martenson,* 779 F.2d 461, 463–64 (8th Cir.1985); *In re Snoonian,* 502 F.2d 110, 112 (1st Cir.1974).

█ This forfeiture proceeding has been brought against property owned by Mrs. Camiola, not against property owned by her husband. As a result, any testimony by Mrs. Camiola would not "disfavor[ ] [her husband's] *legal interests in the very case* in which the testimony is offered." 8 Wigmore, *supra* § 2234, at 231. That testimony could disfavor only Mrs. Camiola's interests. The relevant distinction in the case before us is not whether the action is criminal or civil. Mrs. Camiola would be equally unable to avail herself of the adverse spousal testimony privilege if this were a criminal prosecution against her. If, for example, following Mr. Camiola's conviction for drug trafficking, the government had sought to prosecute Mrs. Camiola for aiding and abetting his criminal activities, she would not, as the defendant in that prosecution, be able to limit her testimony by asserting her right not to testify against her husband. For the same reason, she may not do so in this forfeiture action.

Mrs. Camiola argues that she should not be forced to testify in this action because the testimony might be used in future proceedings against her husband. This argument is unpersuasive. The government has guaranteed that Mrs. Camiola's testimony in this case will not be offered as evidence in any other case against her husband. Thus, if the government were to attempt further prosecution of her husband, Mrs. Camiola could both exclude the testimony sought from her today, and also refuse to testify against him at that time.

Even had the government not offered such a guarantee, moreover, the possibility of some future prosecution against Mr. Camiola is far too speculative to justify application of the privilege. Wigmore, as we have seen, describes the privilege as limited to situations in which the non-witness spouse's legal interests might be disfavored *"in the very case* in which the testimony is offered," 8 Wigmore, *supra* § 2234, at 231. The furthest that the adverse spousal testimony privilege has ever been extended beyond cases of the sort Wigmore describes was in *In re Grand Jury Matter,* 673 F.2d 688 (3d Cir.), *cert. denied,* 459 U.S. 1015, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982). The Third Circuit there applied the privilege to protect a woman from testifying in a grand jury proceeding against a third party, where the government had acknowledged that one reason it wanted her testimony was to obtain sufficient information to indict her husband before another grand jury. *Id.* at 689–90. The Third Circuit noted that it was making a significant departure from the traditional rule, and carefully limited the scope of its holding to situations in which the government is manifestly seeking to use a spouse's testimony in one proceeding against her or his partner in a related proceeding. *Id.* at 692–93.

No other court has followed the Third Circuit in thus expanding the reach of the adverse spousal testimony privilege. And even that court's approach is distinctly narrower than what Mrs. Camiola asks us to do here. Particularly in light of the Supreme Court's admonition that the adverse spousal testimony privilege should be "strictly construed," *Trammel,* 445 U.S. at 50, 100 S.Ct. at 912, we are not willing to extend the law as far as Mrs. Camiola seeks.[3]

*Confidential Marital Communications Privilege*

Mrs. Camiola argues that, even if the adverse spousal testimony privilege is inapplicable in this case, she can refuse to testify about her conversations with her husband

---

3. Because the adverse spousal testimony privilege is not available to Mrs. Camiola in this case, we do not need to consider whether invocation of the privilege would permit the fact-finder in a civil dispute to draw any adverse inferences. We do note, however, that in the context of the adverse spousal testimony privilege, any possible adverse inference would refer to the activities of another party, while in the Fifth Amendment context, where such inferences are permitted in civil suits, the inferences refer to the activities of the person who fails to testify. Whether this fact is itself a ground for distinguishing between the two situations is something we also need not decide.

following his arrest because those conversations are protected by the privilege that covers confidential marital communications.

The District Court concluded that any spouse who asserts an innocent owner defense to civil forfeiture, by that very act "put[s] in issue her knowledge of her husband's drug dealing and [ ] therefore waive[s] the confidential marital communications privilege." *281 Syosset Woodbury Rd.,* 862 F.Supp. at 854. The District Court analogized this situation to the medical malpractice context, noting that a patient who sues a doctor cannot then assert the doctor-patient privilege because it was the patient's decision to sue the doctor that made the substance of their conversation a disputed issue. *See id.* at 854–55; *First Interstate Bank v. National Bank & Trust,* 127 F.R.D. 186, 188 (D.Or. 1989); *Hoenig v. Westphal,* 52 N.Y.2d 605, 439 N.Y.S.2d 831, 832, 422 N.E.2d 491, 492 (1981).

In a medical malpractice situation, however, the doctor will almost always need to point to the substance of the confidential doctor-patient conversations in order to defend against the patient's claims. *See Hoenig,* 439 N.Y.S.2d at 833, 422 N.E.2d at 493. Under the circumstances, it would be unjust to allow the patient to interfere with that defense by invoking confidentiality. Civil asset forfeiture is quite different. The claimant seeking to assert an innocent owner defense bears a heavy burden in trying to prove that defense. The need to have an *automatic* waiver of the confidentiality privilege to be fair to the other party is thus significantly diminished.

Another case, arising in the attorney-client privilege context, may seem more on point. This Court has held that a defendant, who had sought to assert a good-faith defense by testifying that he believed his actions were legal, waived his attorney-client privilege when he asserted that defense. *See United States v. Bilzerian,* 926 F.2d 1285, 1291–94 (2d Cir.1991).

In the end, though, whether *Bilzerian* is distinguishable from the case before us, like the ultimate question of whether mere assertion of an innocent owner defense by a spouse constitutes a waiver of the confiden-

tial marital communications privilege, does not need to be decided today. For Mrs. Camiola did not simply assert the innocent owner defense. She also testified willingly regarding confidential conversations that she had had with her husband prior to his arrest.

■ Like other testimonial privileges protecting confidences, "the confidential marital communications privilege may be waived by 'some act of testimony which in fairness places the person in a position not to object to further disclosure.'" *United States v. Brown,* 634 F.2d 819, 829 (5th Cir.1981) (quoting 8 Wigmore, *supra* § 2340, at 671). Thus, in discussing the Fifth Amendment's privilege against self-incrimination, this Court has said that an act of testimony can constitute a waiver of the privilege when the witness's prior statements create a risk that the truth will be distorted and when the witness should reasonably have known that his or her statements would be interpreted as a waiver of the privilege. *See Klein v. Harris,* 667 F.2d 274, 287–89 (2d Cir.1981).

■ The confidential marital communications privilege is no more sacred than the Fifth Amendment. When a witness who has previously testified voluntarily about the contents of certain confidential marital communications seeks, later, to invoke the privilege to protect other communications, the court is confronted with "a significant danger of distortion. 'To uphold a claim of privilege [in such a case] . . . would open the way to distortion of facts by permitting a witness to select any stopping place in the testimony.'" *Id.* at 288 (quoting *Rogers v. United States,* 340 U.S. 367, 371, 71 S.Ct. 438, 440–41, 95 L.Ed. 344 (1951)). In such a situation, this privilege, no less than the Fifth Amendment, can be deemed to have been waived.

Mrs. Camiola claims that distinguishing between the pre- and post-arrest conversations she had with her husband does not create a risk of distortion because those conversations are fundamentally different. She had to reveal the contents of the pre-arrest conversations in order to assert her innocent-owner defense. But the post-arrest conversations are irrelevant to that defense because she admits that she knew of her husband's

illegal activities following his arrest. The government responds that the contents of the post-arrest conversations would help to establish whether Mrs. Camiola was—as she claims—just learning of her husband's drug involvement, or whether she had knowledge of it before his arrest.

■ It is not, in fact, obvious in this case that the truth would be substantially distorted were Mrs. Camiola permitted to limit her testimony to conversations that occurred before her husband's arrest. We cannot say, however, that the District Court's conclusion that the government would be unfairly burdened by Mrs. Camiola's ability to pick and choose which confidences to reveal was unsupported by the evidence presented to the court. It was also reasonable for the District Court to conclude that Mrs. Camiola should have known that her earlier testimony might constitute a waiver of the confidential communications privilege. Mrs. Camiola's voluntary testimony included considerable detail about her intimate relationship with her husband, including the substance of many private conversations between them. The District Court could certainly find that she should have anticipated that, by testifying in part, she had, for the purposes of this legal proceeding, waived any claim she might have had to the preservation of marital confidentiality. Under the circumstances, the decision of the District Court that the privilege was waived must be upheld.

■ The District Court found that, if the marital communications privilege had not been waived, the joint crime exception, recognized by this Court in *United States v. Estes,* 793 F.2d 465 (2d Cir.1986), applied. This conclusion is not supported by the evidence. *Estes* defined the exception as applicable only when "the spouse of an accused [would] testify willingly concerning their joint criminal activities." *Id.* at 468. The line of questioning that led Mrs. Camiola to invoke the marital privileges appears to have been designed to elicit information concerning an alleged scheme between Mr. and Mrs. Camiola and a man called Carlos for a drug sale to finance Mr. Camiola's legal fees. Given her expressed reluctance to testify—not only with respect to the alleged crime, but as

to any other post-arrest marital communications—both at that point in the proceedings and in all subsequent briefs and oral presentations, there is no way in which Mrs. Camiola's testimony can fairly be characterized as "willing". The joint crime exception is not on point.

### CONCLUSION

The privilege against adverse spousal testimony does not apply because the testimony at issue does not disfavor Mrs. Camiola's husband in the forfeiture case before the court. The District Court acted well within its discretion in holding that the confidential marital communications privilege had been waived by Mrs. Camiola's testimony about conversations that she had with her husband before his arrest. Accordingly, the judgment of the District Court is affirmed.

