In re DONALD SHELDON
& CO., INC., Debtor.

Don L. HORWITZ, Trustee for the
Liquidation of Donald Sheldon
& Co., Inc., Plaintiff,

v.

Donald SHELDON, Defendant.

Bankruptcy No. 85–6538 AJG.
Adv. 89–6256 AJG.

United States Bankruptcy Court,
S.D. New York.

Jan. 2, 1996.

As Corrected Jan. 17, 1996.

Goldman & Hafetz by Lawrence S. Goldman, Anastasia G. Margaris, of Counsel, New York City, for Donald Sheldon.

Kaye, Scholer, Fierman, Hays & Handler by Jay G. Strum, John W. Schryber, Ross D. Cooper, of Counsel, New York City, for Trustee.

## DECISION ON INVOCATION OF SPOUSAL PRIVILEGE

ARTHUR J. GONZALEZ, Bankruptcy Judge.

### INTRODUCTION

Donald Sheldon is the principal and founder of Donald Sheldon & Co., Inc. (the "Debtor"), a securities brokerage house, which filed for Securities Investor Protection Act ("SIPA") liquidation in 1985. *See Federal Insurance Co. v. Horwitz (In re Donald Sheldon & Co., Inc.)*, 150 B.R. 314, 315 (S.D.N.Y.1993). In 1989 Don L. Horwitz, the

District Court appointed Trustee (the "Trustee"[1]) of the Debtor, sued Mr. Sheldon for losses totaling roughly $14 million that ensued from the Debtor's failure. *Id.* at 315–16. In a jury trial before the Honorable Francis G. Conrad, Mr. Sheldon was found liable to the Debtor's estate for approximately $10 million, plus interest and costs (the "Judgment"). *Id.* Mr. Sheldon moved for a stay of the execution of the Trustee's Judgment without posting the necessary supersedeas bond. (*Horwitz v. Sheldon*, 93 Civ. 4209 (RO), Endorsed Memorandum 9/28/93.) Judge Conrad denied the foregoing motion and the Honorable Richard Owen denied Mr. Sheldon's interlocutory appeal for a stay. (*Id.*)

### BACKGROUND

#### Contempt Proceedings

Thereafter, the Trustee scheduled a deposition[2] of Mr. Sheldon, to ascertain the whereabouts of any assets Mr. Sheldon possessed to satisfy the Judgment. Mr. Sheldon failed to appear for the deposition.

Judge Conrad issued a Contempt Order finding Mr. Sheldon in contempt of court for failing to provide testimony and documents regarding his assets which this Court ordered him to produce on March 15, 1993, May 19, 1993, and August 13, 1993. (Conrad Contempt Order, 7/29/93). The Contempt Order provided that Mr. Sheldon's contempt would not be purged until he had completed the deposition.

Further, the Contempt Order provided for the issuance of a Body Execution Warrant, which ordered the "seize[ure] [of] the person of Donald T. Sheldon." Mr. Sheldon did not appeal the Contempt Order.

On or about November 9, 1995, this Court entered an Amended Body Execution Warrant ordering the seizure of Mr. Sheldon "for his contempt of this Court's orders of March 15, 1993, May 19, 1993, and August 13, 1993 directing that he provide discovery of the location and amounts of his assets."

---

1. Hereinafter, references to the Trustee denote either the Trustee or his counsel.

2. The deposition was noticed pursuant to Federal Rules of Bankruptcy Procedure 7030, 7034, 7069, 2004 and 15 U.S.C. § 78fff–1(d)(2).

On Friday, November 10, 1995, the U.S. Marshals arrested Mr. Sheldon and held him in confinement over the weekend.

### Sheldon Deposition Chronology

On Monday, November 13, 1995, before the commencement of the deposition, the Court (Judge Gallet) advised Mr. Sheldon that the Court and Trustee could wait until counsel arrived to represent him before commencing the deposition. (Tr. 11/13/95 at 3, 11:00 a.m.) Mr. Sheldon indicated he could not afford an attorney, stating, "I have no money to buy an attorney." (*Id.*) The Court informed Mr. Sheldon that if Mr. Sheldon could establish he were indigent, a court appointed attorney could be provided for bail purposes. (*Id.*) The Court also informed Mr. Sheldon that because he was there for an examination in a civil proceeding, the government was not obligated to provide him with counsel. (*Id.* at 3–4.) Mr. Sheldon stated that he planned on cooperating with the Trustee for purposes of completing the deposition:

> The last request I made of an attorney was to contact [the Trustee] and negotiate a settlement. That was never done. I have no idea what [the Trustee] has in mind, but I don't really care. Whatever [he] has in mind, I am perfectly willing to do.

(*Id.* at 4.) The Court directed the deposition to proceed and continue until its completion. (*Id.*) The Court also advised the parties that it was available to resolve any discovery disputes. (*Id.* at 5.)

Thereafter, the Trustee sought the Court's intervention regarding a discovery issue concerning alleged evasive responses. (Hearing Tr. 11/13/95 at 3–4, 4:00 p.m.) After listening to a number of the questions and responses, without ruling whether Mr. Sheldon was evasive in the deposition, the Court admonished Mr. Sheldon and urged him to return to the deposition and that he was "required to give as much information, specific and detailed, as [he reasonably had]." (*Id.* at 3–6.) The Court informed Mr. Sheldon that he had the right to invoke the Fifth Amendment privilege. (*Id.* at 6.) However, if he chose to, he was required to indicate the basis for the privilege. (*Id.*) In addition, Mr. Sheldon admitted that he was hiding from the Trustee for the past two and a half years. (*Id.* at 9–11.) Mr. Sheldon indicated he wished to proceed with the deposition. (*Id.* at 4–5.)

That evening the Court's intervention was requested again. The Court (Judge Gonzalez) began the proceeding by inquiring whether Mr. Sheldon was again declining the opportunity to retain counsel. (Tr. 11/13/95 at 3, 7:30 p.m.) This time, Mr. Sheldon indicated he was attempting to retain counsel. (*Id.*) Judge Gonzalez recommended that Mr. Sheldon continue his efforts in obtaining counsel. (*Id.* at 4.) The Court advised Mr. Sheldon that because he admitted that he had been a fugitive from this Court's order for the past two and one half years, the Court could not be assured of his return to complete the deposition and therefore ordered that Mr. Sheldon continue in the Marshal's custody. (*Id.* at 8.) The Court adjourned the deposition for the following morning. (*Id.*)

On November 14, 1995, Mr. Sheldon requested more time to retain counsel. (Tr. 11/14/95 at 4, 10:40 a.m.) Again, the Court indicated that it supported Mr. Sheldon's decision to retain counsel but made clear that because Mr. Sheldon was a "flight" risk, he would stay in custody. (*Id.* at 4–8.) The Court adjourned the deposition to November 20, 1995 but advised Mr. Sheldon that if he were to retain counsel earlier and wished to advance the date for the deposition or set a hearing, the Court was readily available to entertain that request. (*Id.* at 8.)

On November 20, 1995, Mr. Sheldon informed the Court that he needed additional time to retain counsel; that counsel had been contacted and would be provided a retainer on November 21, 1995; however, counsel would not commence representation until the retainer check had cleared. (Tr. 11/20/95 at 9–11, 10:52 a.m.) The deposition was adjourned until November 27, 1995 and Mr. Sheldon's custody continued. (*Id.* at 11–12.) Judge Gonzalez informed the parties that he would be in Washington, DC on November 27, 1995 and that he had arranged with Judge Gallet for him to handle the matter on the 27th. (*Id.* at 12.)

On November 27, 1995, before Judge Gallet, Mrs. Sheldon advised the Court that the checks (referring to the retainer checks issued to the Sheldons' respective proposed counsel) had not yet cleared. (Tr. 11/27/95 at 7.) Judge Gallet rescheduled Mr. Sheldon's appearance for December 6, 1995 at 9:30 a.m. (*Id.*) The custody order was continued. (*Id.* at 9.)

On December 6, 1995, the deposition continued. (Tr. 12/6/95 at 23–24, 9:30 a.m.) Mr. Sheldon, now represented by counsel, invoked the Fifth Amendment approximately seventy times and the spousal privilege ten times. Counsel for Mr. Sheldon moved for his release. (*Id.* at 132.)

This Court ruled that even if a rational basis were established with respect to the questions in which Mr. Sheldon raised the Fifth Amendment privilege, the Court still had to determine whether there had been a waiver of the Fifth Amendment and whether the spousal privilege was properly asserted. (*Id.* at 138.) Therefore, the deposition was not completed and the issue to be resolved was whether Mr. Sheldon should remain in custody to assure his continued appearance regarding the deposition. (*Id.* at 144–150.) Inasmuch as counsel had not provided adequate assurance of Mr. Sheldon's continued appearance, the Court ordered that Mr. Sheldon was to remain in custody. (*Id.*) Argument was set for the next day, December 7, 1995, with respect to the continued custody issues. (*Id.* at 150–151.) Also, an *in camera* hearing was scheduled for December 7th to afford counsel for Mr. Sheldon an opportunity to establish the basis for the assertion of Mr. Sheldon's Fifth Amendment privilege. (*Id.*)

Following the *in camera* hearing on December 7, 1995 the Court found that a *prima facie* case had been made with respect to the questions to which the Fifth Amendment privilege was asserted. (Tr. 12/7/95 at 5.) However, the issue of the waiver of the Fifth Amendment and whether the spousal privilege was properly asserted still had to be decided by the Court. (*Id.* at 5–8.) Mr. Sheldon's counsel indicated he was unable to put a "bail package" together. (*Id.* at 11–12.) Mr. Sheldon's counsel moved for the release of Mr. Sheldon. (*Id.* at 18–19.) Judge Gonzalez directed counsel to "come up with some way to ensure that Mr. Sheldon will be here Monday, beyond what [he] proposed." (*Id.* at 43–44.) Judge Gonzalez suggested to counsel to consider Title 18 and propose to the Court a creative way of assuring Mr. Sheldon's appearance on Monday, December 11, 1995 if he were released. (*Id.* at 44.) The hearing was adjourned to December 8, 1995. (*Id.* at 43.)

On December 8, 1995, counsel for Mr. Sheldon telephoned chambers to request an adjournment of the hearing set for that date. Counsel indicated that he had been informed the night before by the U.S. Attorney's Office for the Southern District of New York that a warrant had been issued by Southern District of New York Magistrate Judge James C. Francis IV for the arrest of Mr. Sheldon for violation of 18 U.S.C. § 401(3). The warrant was issued for criminal contempt based on Mr. Sheldon's failure to comply with Judge Francis G. Conrad's March 15, 1993 Order. Counsel noted there was no reason to appear with respect to a bail package because even if Mr. Sheldon were released by order of the bankruptcy court, Mr. Sheldon would immediately be taken into custody based on the aforementioned warrant.

On December 11, 1995, this Court found that the issuance of the warrant by the Magistrate Judge provided it with assurance that Mr. Sheldon would attend future hearings regarding the deposition and, if necessary, its resumption. (Tr. 12/11/95 at 13–14.) Accordingly, this Court directed the Marshals to process Mr. Sheldon's release. (*Id.* at 14–15.) The parties were directed to attend a hearing on December 18, 1995 for rulings on the privilege and Fifth Amendment issues. (*Id.* at 12, 14, 47.) The hearing was subsequently adjourned to December 20, 1995 and then December 29, 1995.

### Donald Sheldon's Deposition Commencing on November 13, 1995

Mr. Sheldon's deposition was commenced on November 13, 1995, pursuant to Judge Conrad's Contempt Order. As indicated previously, Mr. Sheldon was not represented by

**44**

counsel during the November 13, 1995 portion of the deposition. The Trustee asked Mr. Sheldon, at the start of the deposition, where he lived; Mr. Sheldon responded "I live wherever I am, Jay [referring to Mr. Strum]." (Deposition Tr. 11/13/95 at 3.) Mr. Sheldon was asked who paid for the motels that he had stayed in and his answer was that his wife paid for all the expenses. (*Id.* at 11, 17, 64–65, 93.) Mr. Sheldon was then asked how his wife paid for the motel bills and his response was "I have no idea." (*Id.* at 11.) Mr. Sheldon was asked whether his wife had any income or provided services to any one in 1995, 1994, and 1993 and what her source of income was. (*Id.* at 15–16.) Mr. Sheldon's responses to these questions were "I don't know" or "I don't recall." (*Id.*) Mr. Sheldon was asked the same questions whether he had any income in 1995, 1994, and 1993 and he responded in the same manner. (*Id.*) Mr. Sheldon was asked "What do you live on?" to which he responded "Air." (*Id.* at 16.)

Mr. Sheldon admitted to owning Bond Information Services, Inc. ["BIS"] (*Id.* at 19.) and Malvern Enterprises. (*Id.* at 32.) Mr. Sheldon was asked if he caused this invoice [dated January 10, 1995, in the amount of $3,600] "for services rendered" to be sent to Frank Henjes & Co., Inc. and whether Frank Henjes paid BIS or some other entity. (*Id.* at 20–21.) Mr. Sheldon was also asked if he rendered services to Frank Henjes & Co., Inc. that would have resulted in a bill being sent to Frank Henjes. (*Id.* at 22.) Mr. Sheldon answers these questions and subsequent questions related to the invoices and services rendered in a evasive manner such as "not to my recollection"; "I don't recall"; and "I don't know." (*Id.* at 21–22.)

Mr. Sheldon was first asked if he had ever heard of an entity known as Ocean Enterprises. (*Id.* at 23.) His answer was "I don't recall." (*Id.*) He was subsequently asked if he ever instructed Mr. Henjes to pay the invoices by wiring money into the account of Ocean Enterprises located at the Barnett Bank of Broward County Florida. (*Id.* at 24.) He answered "You know, I might have, but I don't recall for sure." (*Id.*) He was also asked that if he did not know anything

about Ocean Enterprises, why he would have requested that money be wired to it. (*Id.*) His answer again was "I don't know." (*Id.*)

Mr. Sheldon was asked if in fact Ocean Enterprises was a sole proprietorship owned by his wife. (*Id.* at 25.) His answer was "I don't know" and subsequently he answered "No. It might be, but I just don't know for sure." (*Id.*) He was asked why he thought his wife owned Ocean Enterprises to which he also answered "I don't know." (*Id.*)

Exhibit 3 of Mr. Sheldon's deposition consisted of three-pages. The first was a copy of an envelope with the name Don written on it with some other writing, and the rest of it consisted of a copy of a letter that began with "Dear Don" and ended with "Love, Linda." [Mrs. Sheldon's first name is Linda.] (*Id.* at 37.)

Mr. Sheldon was asked if he had seen this before, and his response was "Jay, I don't know. I just don't recall seeing it, no. I might have. I don't know." (*Id.* at 37–38.) Mr. Sheldon was asked whether he recognized the handwriting and his response was "Jay, I don't recognize handwriting, period." (*Id.* at 38.) Mr. Sheldon was then asked questions about the contents of the letter. Mr. Sheldon was asked if he knew who Terri was being referred to in the letter to which he said that he was guessing but that it would be a reference to his daughter Theresa. (*Id.* at 39–40.) He was asked why his wife was asking whether Chubb [one of the insurance carriers of Mr. Sheldon's Officer and Director liability policy] knew anything about his assets to which he stated "I have no idea." (*Id.* at 40.) Mr. Sheldon was asked if he ever discussed with his wife what Chubb may have known about Bond Information Services or Malvern to which he responded "Jay, I may have, but I don't recall." (*Id.*) Mr. Sheldon was asked if Kaye Scholar made a motion to dismiss any appeal of his to which he answered "I don't know. I just don't recall. I just have no idea." (*Id.*) The Trustee quoted a line from the letter which stated the following: "And what do they know and what do we need to do to protect them [presumably referring to assets] if they know anything?" (*Id.* at 42.) Mr. Sheldon was asked if he ever discussed with his wife

what they needed to do to protect his assets if Chubb knew anything as to his assets to which he responded "Not that I recall." (*Id.* at 42–43.) Another sentence of the letter stated the following "I'll overnight a copy of Kaye Scholar [referring to Trustee's counsel] motion to dismiss your appeal to Jim." (*Id.* at 41.) Mr. Sheldon was then asked if he ever discussed an appeal with Jim Frehter from Strook, Strook & Lavan to which he answered "Yes, sir, I did." (*Id.* at 42.) Mr. Sheldon was asked if he thought his wife wrote the letter to which he stated "I have no idea." (*Id.* at 43.)

After a recess was taken, Mr. Sheldon was asked if he paid any expenses; he answered in the negative. (*Id.* at 65.) He was then asked why and he responded that he did not have any money. (*Id.*) The next question was "But your wife does?" to which Mr. Sheldon just stated that she pays the bills. (*Id.*) The Trustee then inquired whether Mr. Sheldon's wife had money; and Mr. Sheldon's response was "I don't know. I assume she must have some money. She pays the bills." (*Id.* at 65–66.) He was asked if he had any individual or joint bank accounts; he answered in the negative. (*Id.* at 71–72.) He was also asked whether his wife had any individual or joint bank accounts; Mr. Sheldon responded in the negative and added "Only what you [Mr. Strum] have told me today, something about Barnett Bank." (*Id.* at 72–73.) He was asked if he had closed any bank accounts since August of 1993 to which he responded "Not that I recall." (*Id.* at 73.) He was subsequently asked if he knew of any accounts that his wife has closed since August of 1993, to which he stated "I have no idea." (*Id.*) He was again asked if he closed any accounts since July of 1992 and he answered "I don't know" or "not that I recall." (*Id.*)

Mr. Sheldon was asked if he ever discussed his wife's financial affairs with her to which he stated "Not really, no, sir." (*Id.* at 76.) He was asked how his wife managed to cover their expenses to which he answered "I really don't discuss financial matters with my wife." (*Id.* at 93.) He was asked whether he knew if his wife provided services recently and his answer was "I'm afraid, Jay, you

would have to discuss that with her. She doesn't discuss her professional business with me." (*Id.* at 97.)

Mr. Sheldon was again asked about Ocean Enterprises' business. (*Id.* at 69.) This time, his answer was "It's my wife's company. You will have to ask her. I don't know." (*Id.*) Mr. Sheldon was asked if Ocean Enterprises had any bank accounts to which he answered "I don't know. You [referring to Mr. Strum] indicated there was a bank account in Ocean Enterprises' name in Barnett Bank, but that's my only knowledge of that." (*Id.* at 74.)

### Frank Henjes' Deposition

On November 15, 1995, the Trustee conducted a deposition of Frank Henjes. Mr. Henjes provided the Trustee with the following information.

Mr. Sheldon and Frank Henjes have know each other for approximately twenty-five years, both professionally and personally. (Deposition Tr. 11/15/95 at 19.) They were both in the municipal bond business and shared information regarding securities transactions. (*Id.*) Mr. Sheldon owned Donald Sheldon & Co., Inc. and Mr. Henjes owned Frank Henjes & Co., Inc. (*Id.* at 19–20.) Mr. Henjes expertise was in selling municipal bonds, particularly Puerto Rico's bond issues, to large institutions. (*Id.* at 18–20.) Mr. Sheldon's company was in the retail market, selling municipal bonds to individuals. (*Id.* at 19.)

Mr. Henjes was aware that Donald Sheldon & Co., Inc. went out of business in 1985 and Mr. Sheldon was hired by Mr. Henjes as a consultant. (*Id.* at 22.) Mr. Sheldon provided services to Frank Henjes & Co., Inc. and received compensation for these services. (*Id.*) Mr. Sheldon worked for Mr. Henjes sometime between 1985 and 1987 for six months and received approximately $8,000.00 a month. (*Id.* at 22–24.) Mr. Henjes' company went out of business sometime in 1987. (*Id.* at 25.)

Mr. Henjes started working for Laidlaw Holdings sometime in 1990 and worked there until January of 1993. (*Id.* at 28–29.) While Mr. Henjes was employed by Laidlaw Holdings, Mr. Sheldon provided consulting ser-

vices to Mr. Henjes as an employee of Laidlaw Holdings. (*Id.* at 29–33.) Mr. Sheldon was compensated for services rendered to Mr. Henjes from 1990 to 1993. (*Id.* at 32–35.)

Sometime in 1991, it appears that Mr. Sheldon was working for Castle Securities. (*Id.* at 39–42; 50–51.) From January 1993 to the present, Mr. Henjes has been working at Sound Pension Management as a partner. During that period, Mr. Sheldon again provided Mr. Henjes with investment advice for which Mr. Sheldon was compensated. (*Id.* at 36.) Mr. Sheldon was paid approximately $1,000.00 per hour for investment services, which were provided directly to Mr. Henjes. (*Id.* at 52.) Mr. Sheldon was compensated only for investment advice provided by him personally to Mr. Henjes. (*Id.* at 54.) Mr. Henjes was directed by Mr. Sheldon to pay such compensation to either Bond Information Services or Ocean Enterprises. (*Id.*)

Mr. Henjes produced several invoices and wire transfer confirmations showing payments to either Bond Information Services or Ocean Enterprises. (*Id.* at 7–18.) These invoices from Bond Information Services for "consulting services" or "for services rendered" and wire transfer confirmations inscribed with "paid by wire" were dated from periods of 1993 to 1995. (*Id.*) Exhibit–11 of the Henjes Deposition was a four-page document which contained (i) a debit memo of Union Trust Company dated June 1, 1994, with the words "wire transfer to Barnett Bank, Florida, Ocean Enterprises" on the face; (ii) an invoice from Bond Information Services, Inc., to Frank Henjes & Company, Inc., dated May, 1994, for consulting in the amount of $3,600; (iii) a funds transfer request to be made to Ocean Enterprises; and (iv) a "check credit" dated June 1, 1994. (*Id.* at 14–15.) Exhibit 7 was a three-page document which contained (i) an invoice from Bond Information Services, Inc., to Frank Henjes & Company, Inc., dated January 10, 1995, for consulting in the amount of $3,600; (ii) a wire transfer confirm dated February 16, 1995; and (iii) a wire transfer request dated February 16, 1995 from Frank Henjes & Company in the amount of $3,600 to Ocean Enterprises. (*Id.* at 20–21.)

### Donald Sheldon's Deposition Continued on December 6, 1995

Mr. Sheldon's deposition was continued on December 6, 1995. The delay between depositions was caused by Mr. Sheldon's requested adjournments to permit him time to retain counsel. On December 6, 1995, Mr. Sheldon was represented by counsel. At this deposition Mr. Sheldon was asked questions concerning similar subject matter and additional subject matter to that asked on November 13, 1995.

### Privilege Assertions

Mr. Sheldon invoked the spousal privilege with respect to the following questions:

1. Has [Mrs. Sheldon] paid or caused to be paid a retainer to her counsel? (Deposition Tr. 12/6/95 at 141.)

2. Did [Mrs. Sheldon] ever make an investment in that enterprise? (*Id.* at 176–177.)

3. Mr. Sheldon, since you have been incarcerated, do you have any knowledge whatsoever concerning any movement of assets of your wife from one place to another? (*Id.* at 185.)

4. Did you request that [Mrs. Sheldon] move any of your assets during your incarceration? (*Id.*)

5. Did you direct [Mrs. Sheldon] move any of your assets of hers during your incarceration? (*Id.*)

6. During 1995, Mr. Sheldon, were you aware of any compensation received by [Mrs. Sheldon] from any source? (*Id.* at 186.)

7. The money that [Mrs. Sheldon] used to pay for the food, where did she get it from? (*Id.* at 206.)

8. Does [Mrs. Sheldon] have any bank accounts? (*Id.* at 209.)

9. Does [Mrs. Sheldon] have an ATM card? (*Id.* at 210.) [Subsequently answered by Mr. Sheldon.]

10. Does [Mrs. Sheldon] have any assets? (*Id.* at 216.)

As indicated previously, Mr. Sheldon invoked the Fifth Amendment privilege ap-

proximately seventy times during the December 6, 1995 continuation of the deposition.

## DISCUSSION

During the December 6, 1995 continued deposition, Mr. Sheldon raised his Fifth Amendment privilege against compulsory self incrimination and spousal privilege as to alleged confidential communications with his wife. U.S. Const. Amend. V.; N.Y.CPLR § 4502(b). This decision only addresses the spousal privilege. The Fifth Amendment issue will be considered in a separate decision.

■ Privileges are governed by Rule 501 of the Federal Rules of Evidence which provides:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of common law as they may be interpreted by the courts of the United States in light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State Law.

Therefore, State law determines whether a matter is privileged when it is relevant to a state law claim or defense being raised before a federal court. *Atlantic Richfield Company v. Triad Petroleum, Inc.*, 120 F.R.D. 471, 472 (S.D.N.Y.1988). This proceeding involved execution of a judgment that was based on New York substantive law. The Judgment was based upon state causes of action (breach of fiduciary duty and breach of contract) and, thus, state law is controlling in this matter.

■ The marital privilege is recognized in New York Civil Practice Law and Rules

§ 4502(b), which provides: "A husband or wife shall not be required, or, without consent of the other if living, allowed, to disclose a confidential communication made by one to the other during the marriage." Neither husband nor wife can be compelled to disclose a confidential communication made by one to the other during their marriage. *People v. McCormack*, 278 A.D. 191, 104 N.Y.S.2d 139, 143 (1st Dept.1951).

■ The Trial Judge must initially determine whether a communication is confidential, and therefore privileged. *People v. Dudley*, 24 N.Y.2d 410, 414, 301 N.Y.S.2d 9, 11, 248 N.E.2d 860, 862 (1969). Not all communications made between a husband and wife are regarded as confidential. *Atlantic Richfield Company v. Triad Petroleum, Inc.*, 113 F.R.D. 686, 687 (S.D.N.Y.1987). Only those communications "which would not have been made but for the absolute confidence in, and induced by, the marital relationship" are privileged. *Id.* (citing *People v. Melski*, 10 N.Y.2d 78, 80, 217 N.Y.S.2d 65, 176 N.E.2d 81 (1961)). "The test is whether the intent exists to rely on the confidence and intimacy of the marital relation in making the disclosure to the partner of the marriage." *McCormack*, 104 N.Y.S.2d at 144.

New York courts have recognized that fraud is "easily practiced and concealed under cover of the marriage relation" and consequently scrutinize business transactions between spouses with the utmost care where the rights of creditors are involved. *G–Fours, Inc. v. Miele* 496 F.2d 809, 813 (2d Cir.1974) (citing *White v. Benjamin*, 150 N.Y. 258, 265, 44 N.E. 956 (1896)); *Herter v. Krzewinski*, 233 A.D. 240, 251 N.Y.S. 331 (4th Dept.1931).

Several other jurisdictions have held that the marital privilege is not available to refuse disclosure of communications designed to perpetrate frauds on third parties. *See, e.g., Brown v. Scafidi*, 839 F.Supp. 342, 344 (E.D.Penn.1993); *Kine v. Forman*, 205 Pa.Super. 305, 209 A.2d 1 (1965)[3]; *Fraser v.*

---

**3.** *Kine* involved a proceeding to compel a judgment debtor-husband to answer questions posed to him by a judgment creditor on a deposition in aid of execution of judgment. The creditor alleged a systemic arrangement of the husband's affairs to place his property in the hands of his wife and beyond the reach of execution; the deposition questions were designed to reveal this

*United States*, 145 F.2d 139, 143–144 (6th Cir.1944), cert. denied, 324 U.S. 849, 65 S.Ct. 684, 89 L.Ed. 1409 (1945); *Tobias v. Adams*, 201 Cal. 689, 258 P. 588, 592 (1927); *Eddy v. Bosley*, 34 Tex.Civ.App. 116, 78 S.W. 565, 568 (1903).

In *G–Fours*, after a judgment had been awarded, the judgment-creditor tried unsuccessfully to collect on the judgment. A marshal's execution obtained only a small portion of the amount awarded. The judgment-creditor then commenced supplementary proceedings to discover hidden or fraudulently transferred assets. In response to information subpoenas and interrogatories, served upon the defendant's wife, inquiring as to information regarding her spouses property and bank accounts and recent transfers made by the defendant to her, she invoked the marital communications privilege. The *G–Fours* court found that the marital privilege does not apply to ordinary business conversations between spouses. *G–Fours*, 496 F.2d at 811 (citing, *Parkhurst v. Berdell*, 110 N.Y. 386, 393–394, 18 N.E. 123 (1888)). This "ordinary business matters" exception applies to "ordinary conversations relating to matters of business which there is no reason to suppose [the spouse] would have been unwilling to hold in the presence of any person," because inquiries into the existence and location of the spouse's bank accounts, or ownership and transfer of property do not encroach upon the marital privilege. *G–Fours*, 496 F.2d at 811–12.

Mr. Sheldon argues that New York law recognizes that spousal communications are presumed confidential even if they concern business transactions and that presumption must be rebutted. *Atlantic Richfield*, 120 F.R.D. at 473. Further, he notes that the facts of this case, taking into consideration the liquidation and the close scrutiny to which their finances were subject, make it clear that the Sheldons intended these communications to be confidential.

His argument, however, is not supported by case law. The *G–Fours* court found that even if the parties intended the communications to be confidential, the communications were not privileged if the spouses were trying to conceal their assets from a judgment-creditor. "[T]he marital privilege is not available to refuse disclosure of communications designed to perpetrate frauds on third parties." *G–Fours*, 496 F.2d at 812.

In the case at bar there is probable cause to believe that the communications between the spouses were intended to facilitate Mr. Sheldon's efforts to secrete assets. Mr. Henjes testified that Mr. Sheldon rendered investment advice in the last two years and that, at Mr. Sheldon's direction, payment for those services were made to Ocean Enterprises. Mr. Sheldon has testified that Ocean Enterprises is his wife's company. Mr. Sheldon's testimony on November 13, 1995 demonstrates a concerted effort on his part not to provide any information regarding sources of his or his wife's income or location of any assets. Further, he has admitted "hiding" for two and a half years from the Trustee who is undeniably—a judgment-creditor of the estate. Moreover, probable cause is further justified based on the letter allegedly written by Mrs. Sheldon to Mr. Sheldon inquiring as to Chubb Insurance Company's knowledge concerning his assets and the efforts required to protect those assets from the insurance company. Chubb's alleged interest in Mr. Sheldon's assets would stem from its potential claim against Mr. Sheldon for amounts it may be liable for under the Directors and Officers policy held by the Debtor. At the very least, this letter is inconsistent with the testimony of Mr. Sheldon regarding the existence and his knowledge about any assets of his or his wife's.

Sheldon's counsel argues that a finding of probable cause to believe the spouses were trying to conceal assets is not the end of the inquiry. Rather, he contends that the *G–Fours* court was actually applying the

chicanery. The husband raised the marital communications privilege to justify his refusal to answer but the court rejected this defense and directed him to testify. The court ruled that the public policy, which protects as confidential the

private communications between husband and wife, does not extend to those communications which are in furtherance of a fraud, at least in a civil action. 209 A.2d at 3.

"crime-fraud exception" without referencing that language because it was prior to the popularity of that phrase. He further argues that since the *G–Fours* case was decided, the standards for the applicability of this exception have been refined. Thus, citing *United States v. Richard Roe, Inc. (In re Richard Roe, Inc.),* 68 F.3d 38 (2d Cir.1995), he argues that the Trustee has not met the current standards applicable for implementation of the "crime-fraud exception". The court in *Richard Roe* addressed the application of the "crime-fraud exception" with respect to the attorney-client privilege and the work-product privilege. According to the *Richard Roe* court, in order for the "crime-fraud exception" to apply, two conditions must be met. First, there must be probable cause to believe that the particular communication was intended in some way to facilitate or conceal criminal activity. Second, there must be probable cause to believe the communication was made in furtherance of the crime.

In the context of the attorney-client relationship, the requirement that the communication be in furtherance of the crime for the crime-fraud exception to apply, is to insure the free flow of information from the client to the attorney. If the standard were merely that the communication provides evidence of a crime, the purpose for the privilege would be frustrated because it would stifle a client from imparting information to its counsel. *Richard Roe,* 68 F.3d at 40. The goal of the attorney-client privilege is to "promote unfettered communication" between the client and its counsel to allow the counsel to render "informed legal advice." *Id.* The purpose of the work product exception is to allow the counsel to develop the materials required to render legal advice. *Id.* The same standards for utilization of the crime-fraud exception were applied to these two privileges because under the facts of the *Richard Roe* case, the court found there was an overlap between the attorney-client privilege and the work product privilege. *Id.* The overlap was present because the information the client furnished to the lawyer merged into his work product. *In re Grand Jury Pro-*

*ceedings (Appeal of FMC Corp.),* 604 F.2d 798, 802 (3d Cir.1979). In addition, the two privileges have a similar purpose, namely "to encourage the proper functioning of the adversary system." *Id.* Inasmuch as the two privileges overlapped, the *Richard Roe* court found no reason to apply different standards for the application of the "crime-fraud exception." *Richard Roe,* 68 F.3d at 41 n. 2.

The purpose of the marital privilege is to encourage domestic peace, and the sanctity of the marital relation. *G–Fours,* 496 F.2d at 812. Even under an application of the crime-fraud exception, there is no reason, in this case, to utilize the same standards for its application that is employed in the attorney-client privilege realm. The requirement that the communication be in furtherance of the crime—while relevant in the attorney-client privilege context—is not relevant in that of the marital privilege, at least not in the case of a civil proceeding in aid of execution of judgment. The reason for the confidential communications privilege in the attorney-client arena is to guarantee the constitutional right to counsel and the best representation available to the client. The main concern is to encourage full disclosure and candid communication between the attorney and client about the past wrongdoing to allow the client to obtain knowledgeable and skilled legal representation. *United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 2625–26, 105 L.Ed.2d 469 (1989). The spousal communication privilege, developed at common law, also seeks to protect uninhibited communication. However, this freedom of communication was meant to promote domestic peace, not to afford opportunity to the married couple to engage in protected communications to perpetrate a fraud upon a judgment-creditor. This may be the reason the *G–Fours* court did not include an "in furtherance" type requirement in its analysis, notwithstanding the fact that the *G–Fours* court gave careful consideration to the standard it applied, noting that in a criminal case the standard applied to find an exception to the marital privilege might be more stringent. *G–Fours,* 496 F.2d at 812.[4]

---

4. The confidential marital communications privilege may be waived by prior testimony. *United*

*States v. Premises known As 281 Syosset Woodbury Road,* 71 F.3d 1067 (2d Cir.1995). In ana-

We hold that the facts of the case before us fall squarely within the Second Circuit's ruling in *G–Fours*. There is probable cause to believe that the Sheldons attempted to conceal assets to prevent the Trustee from executing on the judgment. Further, those questions upon which the spousal privilege was asserted relate to the existence or location of the allegedly concealed assets. Thus, the communications are not privileged even if the parties intended them to be confidential.[5]

## Conclusion

Mr. Sheldon may not invoke the marital privilege with respect to the questions at issue. The deposition is to continue and Mr. Sheldon is directed to respond to those questions.

The Trustee is directed to settle an order on three days' notice.

lyzing whether there is a waiver, courts apply the same standard used to evaluate waiver of the Fifth Amendment privilege. *Id.* The Trustee has not raised the issue of whether Mr. Sheldon waived the marital privilege by testifying as to the issue of communications with his spouse related to financial matters. Inasmuch as this Court finds that Mr. Sheldon may not invoke the marital privilege, we do not address waiver of that privilege.

**5.** Furthermore, even if this Court were required to find probable cause that the communications between the Sheldons were in furtherance of the fraud, this Court finds that based on the facts detailed in this decision, there is probable cause that the communications were in furtherance of Mr. Sheldon's efforts to conceal and transfer his assets.